## JEFF POLING v. STATE.

No. A-2206.    Opinion Filed October 4, 1915.

(151 Pac. 895.)

1.    **HOMICIDE—Evidence—Sufficiency.** In a prosecution for murder, the evidence reviewed and held sufficient to sustain the conviction with imprisonment for life as the punishment.

2.    **HOMICIDE—Evidence—Dying Declarations.** The rule is universal that before dying declarations can be admitted in evidence it must appear that they were made under a sense of impending death, but it is not essential that the declarant state that they are so made. It is sufficient if it satisfacorily appears in any manner that they were made under that sanction.

3.    **HOMICIDE — Dying Declarations.** Dying declarations may be made by signs as well as by words, and where the declarant is in a dying condition, and so injured as to be unable to speak, the fact that in response to questions her answers were indicated by nodding and shaking her head, and pointing her finger, forms no objection to the competency and admissibility of such declarations.

4.    **EVIDENCE—Res Gestae.** Declarations by a person whose throat was cut, and windpipe severed, and therefore speechless, made by signs in the presence of the defendant a few minutes after the wound was inflicted under circumstances that excluded the presumption that they were the result of premeditation and design are admissible as a part of the res gestae.

5.    **REVIEW—Instructions.** Instructions given by the court and not excepted to by the defendant at the trial or before the trial court, will not be reviewed on appeal, unless fundamental error is apparent.

6.    **MISCONDUCT OF JURY.** The mere fact that in response to an inquiry of the court as to how the jury stood numerically, the foreman answered: ''Eight for conviction and Four—'' is no ground for a new trial, where it does not appear that the defendant was prejudiced by such misconduct.

*Appeal from District Court, Washington County;*
*R. H. Hudson, Judge.*

Jeff Poling was convicted of murder, and appeals.    Affirmed.

*Harry E. Price,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *R. McMillan,* Asst. Atty. Gen., for the State.

DOYLE, P. J.   The plaintiff in error, Jeff Poling, was convicted of the murder of his wife and in pursuance of the verdict of the jury, he was sentenced to imprisonment in the penitentiary for life, at hard labor.   From the judgment, he appeals.

We shall first consider the assignment of error that the evidence was insufficient to sustain the verdict.   As this is the only substantial question raised on this appeal, we will state the evidence in some detail.   It appears that the defendant, Jeff Poling, and the deceased, Sarah Poling, sometimes called "Emma," had been married about sixteen years.   Their home was in Bartlesville, on West Third street, being that part of the city that is commonly known as Smeltertown.   The west half of the building was used for a restaurant; the east half, used as a living room, had a front door on the north and a side door on the east.   It further appears that they had some family trouble, and about a week before the tragedy, Mrs. Poling had left home and was living with her step-son on the same street.   On July 11, 1913, about ten o'clock in the forenoon, the defendant was standing in front of his restaurant, talking with some other men; the deceased was walking along on the other side of the street, and he called to her to come over to the house, and she crossed the street, and after talking a few minutes they went into the living room, through the east door. Soon after, the deceased rushed out with her throat cut from ear to ear.   She was helped back into the house and placed on a bed.

Dr. Smith testified that he was passing nearby and was called to attend Mrs. Poling, and found two or three persons holding her in a sitting position on the bed; that he found the muscles of the neck and both arteries and veins severed, and the trachea or windpipe was completely severed; that it was a straight cut, and it appeared that the instrument used came out on the right side of the neck.

Ralph Berry testified that he had known the Polings several years; that their place was next door to his place, with an alley-way

of seven or eight feet between; that about fourteen feet back, there was a door on the east side of the Poling building; that about half-past ten that morning, he had stepped out of his place and was sitting between the buildings, and heard the defendant call to the deceased, who was across the street, and she came across and they all talked for a few minutes. Poling said: "Ralph, she won't live with me any more; she don't care nothing for me," and I said to him: "I don't think it is that, Jeff; she thinks enough of you, but just can't put up with your ways," and she said a word or two, and said that he had been threatening to kill himself; they then entered their home through the east door; that three or four minutes later, he heard a struggle or scuffle inside, and the defendant opened the door and called him, saying that his wife had cut her throat. Just then she came out the door and walked to the sidewalk. Witness called Mrs. Ida Grose; that he tried to open the front door and found it locked; he then ran in the side door and opened it from the inside, and they carried her in the front door, and he left to call a doctor.

Ernest Clarady testified that he was a deputy constable, and was standing on the street when Mrs. Poling came out, and heard Poling say that his wife had cut her throat; that he took her left arm and the defendant took her right arm, and they helped her into the house and placed her on the side of the bed; that Mrs. Grose was present. His further testimony, as shown by the transcript, is as follows:

"Q. Did you hear any conversation between Mrs. Grose and Mrs. Poling?

"Mr. Price: Objected to as incompetent and immaterial, and no foundation laid for a dying declaration.

"Mr. Donahue: The defendant was there, present, if the court please.

"The Court: You had better ask him; he has not testified he was there.

"Q. Did you hear any conversation between Mrs. Grose and Mrs. Poling in the presence of the defendant there? A. Yes, sir.

"Q. You may state what that conversation was? A. Mrs. Grose asked the woman if she did it; of course, she could not say anything, and I didn't look at her myself only when I would talk

to her myself. I asked her twice if she did it, and she shook her head that way (indicating).

"Q. She shook her head up and down, or from side to side, which? A. Side to side.

"Q. Did you have any conversation with the deceased, Sarah Poling, in the presence of the defendant, Jeff Poling? A. Yes, sir.

"Q. Just tell what that conversation was? A. I never asked her anything only if she done that herself.

"Q. What did you say to her? Just tell the jury now your exact words as near as you can—what she said in reply and what she did? A. I says 'Lady, did you do this yourself?,' and she shook her head, that way. I asked her the question twice.

"Q. Was she sitting up or lying down when you asked her the question? A. She was sitting up."

He further testified that when he went in, he saw the razor lying on the floor, and that it had blood on it.

E. V. Anthony testified that he lived at Smeltertown, and about eleven o'clock that morning saw Jeff and Mrs. Poling and Mr. Berry sitting between their buildings; that he went into Berry's place, staying there ten or fifteen minutes and when he came out the side door was open and he saw Jeff Poling and Mrs. Poling sitting on their bed, and Jeff Poling rose up and closed the door. Mr. Berry was sitting in the alley, and he sat down and was talking with him, when he heard a scuffle or struggle in the east room of the Poling place and Jeff Poling opened the door and called to Mr. Berry that his wife had cut her throat, and Mrs. Poling stepped out the door and walked out in front and Jeff followed her.

Cy Smith testified that he was in a shoe shop, about fifty or sixty yards east of Poling's restaurant that morning between nine and ten o'clock, and John Ebbs and Jeff Poling were there at that time. Poling was sitting in the door with his feet on the outside and Ebbs and witness were on the inside. While they were talking, Mrs. Poling went by, crossing the street, and the defendant said she was going over to telephone for a job. He further testified:

"Q. What else did he say? A. Well, he said she was going to telephone for a job and if she got a job, he was going to tell them it was his wife and if they gave her work he would kill

them; that was all he said there, and when she came out from there, she went up between my son's house and the next house, and he said she was going up to his brother's, and said he was going to have a talk with her and he left.

"Q. Did you see him or her, later that morning? A. Yes, sir.

"Q. Well, what was it, if anything, that attracted your attention to them? A. Well, I· was sitting in about the same place and I looked out and seen someone crossing the street, and I heard him holler and I went on up.

"Q. Did you hear what he said? A. He called Arthur, his son.

"Q. Then what did you do? A. I went up there.

"Q. And when you got up there, what did you find? A. When I got up there, they had her in the house and she was sitting on the bed.

"Q. Who else, if anyone, were present at that time? A. I don't know hardly; I saw Art Poling in there. There was several in there.

"Q. Do you know Mrs. Grose? A. Yes, sir.

"Q. Did you see her there at that time? A. Yes, sir.

"Q. Did you have any conversation with Mrs. Poling there? A. I did, on the inside.

"Q. Just state what that conversation was? (No answer).

"Q. Was the defendant present? A. Yes, sir.

"Q. Just state what that conversation was? A. Well, I heard some woman ask—at least I took it to be a woman—if she cut her throat, and I looked at her when they asked her that, and she shook her head 'no.'"

John Ebbs testified that he was sitting with Cy Smith and Jeff Poling at the shoe shop when Mrs. Poling passed, and the defendant said something about her going to get a job of some kind up town, and "He said that was his wife, and he didn't want her to work for no one, and he would not allow her to work for no one; and he said he would not allow no man to employ her; that he would give him trouble." And "I believe he said he was going to have a talk with her that morning or that afternoon."

Thelma Jones testified that she worked for the Polings in their restaurant about three weeks, but had quit work about two weeks before Mrs. Poling's death; that the Polings quarreled and had

trouble, and in one of their quarrels she heard the defendant say to Mrs. Poling "You keep on until I will have to kill you."

Mrs. Ida Grose testified that she lived in West Bartlesville, just across the street from the Polings, and heard Mr. Poling hollow, and went over there. That Mr. Clarady and Arthur Poling were in there, and that she had a conversation with Mrs. Poling. She further testified as follows:

"Q. What was this conversation about that you had with her? A. I asked her if she done it—did it; asked her if she done that.

"Q. Mrs. Grose, just state to the jury what you said to her and what she said or did in answer to your question? A. Well, I asked her if she done it; I put my hand on her shoulder, and I says 'Emma, did you do this?' and she raised her eyes to mine and shook her head, and I said 'Who did do it?'

"Q. Just state as nearly as you can recollect the exact language that was used, both by you, and what she did? A. I said 'Emma, did you do this?' and she shook her head that she didn't, and I said 'Who did do it?' and she turned her head towards Mr. Poling and pointed her finger like that, and I says 'Emma, did de do it?' and she nods her head that he did.

"Q. Where was she at the time this conversation took place? A. She was sitting on the foot of the bed.

"Q. Wes she sitting up or lying down? A. Sitting up.

"Q. Where was Jeff Poling with reference to her? A. He was at the foot of the bed.

"Q. You say she turned and pointed to him? A. Yes, sir, she turned her head and pointed to Mr. Poling.

"Q. Did she turn and point her finger directly at the defendant, Jeff Poling? A. She did.

"Q. Did she appear to understand your question? A. She did.

"Q. Did she appear to be conscious and understand what you said? A. Yes, sir.

"Q. Is that all of the conversation? A. That is all of the conversation.

"Q. Did she sit up after she had pointed to her husband and said he did it—did she remain sitting? A. Yes, sir, she was sitting."

For the defense, Arthur Poling testified that he was the defendant's son, and the deceased was his stepmother; that he

lived in the same block, and hearing that something was happening at his father's, he ran that way; that Mrs. Grose followed him into the room; that when he went in, he asked the deceased if she did this, but noticed before he asked the question that her head was moving from side to side; that he also asked her if his father did it, and her head continued to move in the same direction.

Testifying in his own behalf, the defendant stated that "My wife killed herself." He was then asked:

"Q. Well, now just tell what took place? A. Well, my wife was sitting on the bed. I and my wife was talking to Mr. Berry. She was not staying at home. She was staying at my son's house, and she come over and set outside and talked a little bit, and then we went inside, and I told her I was going to start business again and she says, I don't want you to run that business. Well then, I says, I will have to go to work. Yes, she says, you will have to go to work if you live with me, and she says, I don't think I will live with anybody. Oh, I says, you are just a joking and I am going to get ready and go to town, I will quarrel with you some other time about this, and I went to the dresser drawer and got my razor and told her I was going to shave, and she would keep quarreling, and I says I would rather be dead than alive, I have a notion to take this razor and cut my head off, and I started to the kitchen to make my lather, and she says, you sit down on the bed by the side of me, and I set down. I had the razor in my left hand, shut up. She says, you go and make the lather and I will shave you. I thought she was in a good humor, and she lay across the bed and cut her throat. I was sitting this way, and I looked back and seen she had cut her throat, and I run out the north door some ten or twelve feet and stopped, she followed and put her hands on the door this way, and stepped out something like that. I had hollered for help three or four times, and by that time Mr. Berry come out of his house and this Mr. Clarady was coming. Berry says Poling take Mrs. Poling in the house, and we took her in the house and set her on the bed, and my son came in next and the razor was laying down some three or four feet away from the bed, aside from the bed, and he picked that razor up and I says don't let them get away with the razor, or throw it away or something, I don't know what I did say. I says keep that razor. I don't know what happened after that; they took me to the front end of the house and set me down until I could come to myself.

Well I had got up off the chair and laid down on the cot, and the next I recollect there was a man coming to me, he told me it was the county attorney, and wanted to know how she had killed herself, and I said I had given her the razor, and they arrested me and brought me down and locked me up. She has often threatened herself, some four or five different times; threatened to kill herself at Pittsburgh; threatened to kill herself at Caney. It seems like every time she said that, nobody was around.

"The Court: Never mind. You had better wait until your counsel asks the questions. He is asking now about the occurrences on that morning. Proceed Mr. Price.

"Q. Were you living with your wife at that time? A. No, sir.

"Q. Did you see Mrs. Grose there that day? A. Yes, sir.

"Q. Where were you when she was talking to your wife? A. I was standing by the foot of the bed.

"Q. Did your wife point her finger at you? A. No, sir.

"Q. At any time? A. No, sir.

"Q. How long after Mrs. Grose left was it that your wife died? A. Well, she died pretty near immediately after we set her on the bed, a couple of minutes, I guess.

"Q. Mrs. Grose was there when they set her on the bed? A. No, sir.

"Q. When did Mrs. Grose get there? A. She came there after we set her on the bed.

"Q. She came after you set her on the bed? A. Yes, sir.

"Q. How long did she sit on the bed? A. Before she died?

"Q. Yes? A. I expect two or three minutes.

"Q. Yes, and how long was it afterwards that Mrs. Grose came in, after you set her on the bed? A. Well, she come in right away after we set her down on the bed.

"Q. What—how was your wife acting, what was she doing when she was sitting on the bed? A. After this happened?

"Q. Yes? A. Why, she was sitting in this kind of a manner, with her head swung down this way.

"Q. And kept turning her head? A. Yes, sir, in this manner (indicating).

"Q. What were you doing with the razor? A. I was going to shave.

"Q. Why didn't you? A. Why didn't I shave?

"Q. Yes. A. Why, she said, 'Give me the razor.'

"Q. With which hand did she cut her throat? A. This hand (indicating right).

"Q. How did she do it? A. I could not say; I did not see her make the lick; she had the razor in this hand; she reached over and took the razor out of my left hand, and dropped it by the side of her and I looked around that way, and she lay back on the bed."

We think we have stated substantially all the material evidence, and stated it as favorable to the defendant as possible. While the evidence in the case may not be regarded as conclusive, the case was clearly for the jury, and it does not appear that the jury were influenced by considerations other than the evidence. Considering the character of the relations existing between the defendant and his wife, evidence of which was properly admitted, and considering the statements which the witnesses for the state testify were made by the defendant in their presence, almost immediately before the tragedy, and considering especially the fact that his wife had left him and had avoided him for several days, and that the defendant had called her from the street, and considering his conduct at the time, and the fact that he expressed no sorrow or regret, it is obvious that the verdict of the jury is supported by the evidence. The credibility of witnesses and the weight to be given their testimony are matters for the determination of the jury, and in weighing the evidence the jurors must be satisfied beyond a reasonable doubt that it establishes the guilt of the defendant. Evidently the defendant's account of the tragedy did not raise in the minds of the jury a reasonable doubt of his guilt.

Counsel for plaintiff in error contends that "The dying declarations of the deceased were not admissible, for the reason that no sufficient foundation had been laid; that it did not appear that they were made under the sense of impending death; that if she did know or think she was going to die, her actions could have been construed in several different ways; that the deceased could have spoken if she had the inclination or mind to do so; that if she was mentally incapable of speech, she was incapable

of nodding or shaking her head or pointing her finger with any degree of intelligence."

The rule is universal that before dying declarations can be admitted in evidence it must appear that they were made under a sense of impending death, but it is not necessary that the person making them state at the time that they are so made, as that fact may be proved, not only by what the declarant said, but by his condition, by the nature and extent of his wounds, or from his conduct or other circumstances of the case.

Mr. Greenlean says, section 158:

"It it enough if it satisfactorily appears, *in any mode*, that they were made under that sanction; whether it be directly proven by the express language of the declarant, or be inferred from his evident danger."

The rule is stated by this court in *Morris* v. *State,* 6th Okla. Cr. 29, and followed in *Addington* v. *State,* 8th Okla. Cr. 703, 130 Pac. 311, as follows:

"It is essential to the admissibility of dying declarations, and is a preliminary fact to be proved by the prosecution, that they were made under a sense of impending death. This may be made to appear from what the injured person said, or where, from the nature and extent of his injuries, it is evident that he must have known that he could not survive. It is sufficient if it satisfactorily appears that they were made under the sense of impending death, whether it be directly proven by the express language of the declarant, or be inferred from his evident danger, or the opinions of the medical attendants, stated to him, or from other circumstances of the case, such as the length of time elapsing between the making of the declarations and his death, and the fact that the declarant was so weak that he could not sign his name and so affixed his mark, all of which are resorted to in order to ascertain the state of declarant's mind."

The deceased only lived a few minutes after the wounds were inflicted and was dying when the declarations were made. It appears that she still retained the mental qualifications to realize her condition and to comprehend the questions asked, and the purpose and effect of her answers. Her wind-pipe was entirely severed, consequently she was speechless. The fact that the deceased could not speak, and that in response to questions her

answers were conveyed by nodding and shaking her head, and pointing her finger, forms no objection to the admissibility of the declarations, and the declarations, although communicated by signs instead of words, were competent, and the foundation for the admission of the same was sufficient under the authorities.

It would seem however, that these declarations were admitted by the court and very properly so, as a part of the *res gestae*. Evidently they were made at a time and place and under circumstances which effectually excluded the presumption that they were the result of premeditation and design and were therefore admissible as a part of the *res gestae*. Tried by either of these tests the declarations were competent and admissible. It also appears that the defendant was present and no denial was made by him at the time, and one at least of the declarations was admissible upon the theory that it was a direct accusation of the commission of the crime made by the deceased in his presence, and his failure to deny or to explain such accusation at the time was in the nature of an admission against interest.

It is also urged that the court erred in defining a reasonable doubt. There was no specific or general objection made, or exception taken to any of the instructions given by the court. We cannot consider questions relating to instructions that were not raised as authorized by the statute, or by the practice of the courts, because if there was error, it was in effect waived. However, owing to the gravity of the crime charged we have carefully examined the instructions and find that they are remarkably free from error and are as favorable to the defendant as he had any right to demand or expect.

The remaining assignment is in respect to alleged misconduct of the jury. It appears from the record that while the jury were deliberating upon their verdict they were returned into court and the following proceedings were had:

"The Court: Without stating which way you stand for conviction or acquittal, just state in numbers how do you stand? A. Eight for conviction and four—

"The Court: I am not asking you to state how you stand for conviction or acquittal, just how you stand in number is what I want to know? A. Eight to four."

Thereupon the court directed the jury to retire in charge of the bailiff for further deliberation.

Counsel contend that the first answer of the juror in response to the inquiry of the court was in violation of that part of section 5005 Rev. Laws, providing that:

"The officer having them under his charge shall not suffer any communication to be made to them, or make any himself, except to ask them if they are agreed upon their verdict, unless by order of the court; and he shall not, before their verdict is rendered, communicate to any person the state of their deliberations, or the verdict agreed upon."

In that this provision applies to any member of the jury as well as the officer having them in charge.

The contention made is without merit. Evidently the answer of the juror was a mere inadvertance, and the statute quoted could have no application whatever. To constitute error it must appear that the defendant was prejudiced by the answer of the juror, or that the action of the court was such as would tend to coerce the jury in arriving at a verdict. The defendant and his counsel were present at the time. No objection was made or exception taken to the proceedings had, and it is not claimed that the court said anything that in any way would tend to influence the jury to return the verdict that was rendered.

A careful examination of the whole case and giving due weight to every consideration urged by counsel for the defendant, satisfies our minds that the plaintiff in error was fairly tried and properly convicted.

The judgment appealed from is therefore affirmed.

FURMAN and ARMSTRONG, JJ., concur.