## A. W. LAIL v. STATE.

No. A-2924.    Opinion Filed September 14, 1918.

(174 Pac. 1099.)

EVIDENCE—Res Gestae. Upon a trial for murder, a spontaneous exclamation made by the deceased, without premeditation or design, at the time of the shooting, and which exclamation tended to explain the circumstances surrounding the killing, is properly a part of the res gestae, and admissible as such.

Appeal from District Court, McCurtain County;
C. E. Dudley, Judge.

A. W. Lail was convicted of murder, and appeals. Affirmed.

Giddings & Giddings, for plaintiff in error.

S. P. Freeling, Atty. Gen., and R. McMillan, Asst. Atty Gen., for the State.

MATSON, J. The defendant, A. W. Lail, was convicted in the district court of McCurtain county of the crime of murder, and his punishment fixed at imprisonment for life. From this judgment of conviction he has appealed to this court, and but one proposition is relied upon for a reversal of the judgment.

Roscoe Strawn, an eyewitness to the homicide, testified to a certain declaration made by the deceased, Virgil

Strawn, at the time of the difficulty, and made upon his
having been shot by the defendant. We quote the follow-
ing from the testimony of the witness, in order to show
the circumstances under which, and the time when, said
declaration was made:

"Q. What time did you and Virgil leave home before
the killing? A. We left something like four or five days
before Virgil was killed. Q. Where did you go? A. We
come to Bismark, he come on to Idabel, and I stayed there
and waited for him until he come back, and then we
started out home. Q. Where were you? How were you
down there? What sort of a conveyance did you have?
A. A wagon. Q. Did you have any load? A. We had
a load; yes, sir. Q. What was it? A. Feed stuff and
probably wire, net wire. Q. What did you—what time
did you pass Lail's house on your return trip? A. I
suppose about 3 o'clock, something like that. Q. Did you
see any one around there? A. Yes, sir. Q. Who? A.
I saw Lail, and I saw his boys, some of them. Q. Had
you passed there going down to 'Bismark? A. Yes, sir.
Q. Did you see any of them there? A. Yes, sir, I saw
him (indicating defendant). Q. Where was he? A. I
think he was in the house. I believe it was in the house,
or yard—I don't remember now. Q. Where were they,
as near as you can tell, and as many of 'them as you can
remember, when you returned? A. One of the boys was
out in the garden plowing, out in front of the house, as
well as I remember, and Lail was down in the field, south
of the house, across the road from the house. Q. About
how far? A. Why, about a hundred yards, I suppose.
Q. About how much was in that field? A. Why, it's a
big field; I don't know how much there is. Q. Did you
notice what Lail was doing? A. Looked to be cutting
bushes. Q. Well, was he still in sight when you went on
by? A. He was in sight when I passed; stayed in sight
until I passed his house. Virgil was walking, and he got
in the wagon, and when Virgil got in the wagon with me,

why, Lail went to the house. Q. How did he go to the house? A. He went—you mean what kind of a movement? A. Yes. A. He went pretty fast. He wasn't running, but he was moving pretty fast. Q. What did you do after Virgil got into the wagon? A. We drove on up the road about a quarter of a mile west to where Robinson Wade was up by the side of the road building fence, and I had given Virgil a little jacking up—

"By Mr. McLendon: We object to that, your honor.

"By the Court: The objection will be sustained.

"By Mr. Nelson: Q. Go on and tell about what you did. A. I had given Virgil a little jacking up—

"By the Court (to the witness): Don't tell that.

"A. We drove up there and stopped and talked to Robinson Wade some. Q. How long did you stay there? A. I don't know. Not long—15, 20 minutes; maybe 30. Q. What was Robinson doing? A. Building a fence. Q. What kind of a fence? A. Rail fence. Q. What was he doing to it? A. He was hauling rails on his wagon. Q. New rails or old ones? A. I don't know. Q. Do you know where he was hauling them from? A. No, sir. Q. Was he loading or unloading his wagon? A. He was putting the rails on the fence, I think, when we called him out to the road. Q. You called him out to the road to talk to him, did you? A. Yes. Q. You say you stayed there about 20 minutes. What did you do then? A. We drove on down the road about a quarter of a mile further. Q. What happened then? A. Lail killed Virgil; shot him in the back from behind a stump with a 30-30 Winchester. Q. How many shots were fired? A. He fired three, and I fired two. Q. Did any of his shots take effect on you? A. None taken effect, only one in my hat band. Q. Where did he hit your hat? A. I had a different hat on than this (indicating witness' own hat). It's at home. Shot this hat band off here (indicating), and out of the hat right here (indicating), and shot that hat band loose there (indicating). Q. Shot the bow loose? A. Yes, sir; shot

the bow loose. Q. Where were you when you fired at Lail? A. I was down on the ground, on the left-hand side of the road, as you go west. Q. Did Virgil say or do anything when he was shot? A. He just hollered and says— (Defendant objects, which said objection is by the court overruled, to which said ruling of the court defendant then and there duly excepted at the time.) A. Virgil says, 'Don't shoot me any more, Mr. Lail; you have done killed me.' That was after he shot me through the hat. Q. Did Virgil get out of the wagon? A. Virgil jumped out of the wagon over me, out on the left-hand side of the wagon. Q. What did you do? A. I got out."

Counsel for defendant contends that the declaration of the deceased above quoted, to wit, "Don't shoot me any more, Mr. Lail; you have done killed me," to which the above objection was made and exception taken, was improperly admitted, because the same is in the nature of a dying declaration, and was admitted without any predicate having been laid for the same.

The declaration was properly admitted as part of the *res gestae*. It occurred contemporaneously with the shooting and tended to explain the circumstances under which the killing took place. The declaration was the spontaneous exclamation of deceased, was not the result of premeditation or design on his part, and its admission under the circumstances was clearly within the rule established by this court in the following cases: *Price v. State*, 1 Okla. Cr. 380, 98 Pac. 447; *Hawkins v. United States*, 3 Okla. Cr. 651, 108 Pac. 561; *Poling v. State*, 12 Okla. Cr. 27, 151 Pac. 895; *Fields v. State*, 13 Okla. Cr. 731, 167 Pac. 344. See, also, Wigmore on Ev., sec. 1747. In the notes to said section Prof. Wigmore quotes with approval the reasoning of Barrows, J., in *State v. Wagner*, 61 Me. 195, as follows:

"We think that the precise ground upon which their admission (evidence of outcries naming an assailant) should be placed in a case like this is substantially the same as that upon which dying declarations are admissible (i. e., necessity and sincerity). * * * No one can doubt that the exclamations of these two women embodied the truth as it appeared to each, and that the cries of alarm and supplication uttered by any and all human beings under similar circumstances would express their perceptions of existing facts as truly as if backed by the sanction of all the oaths known in Christendom. We merely say that whatever force is given to dying declarations, as the utterance of those who on account of their peculiar situation may be relied on to tell the exact truth as it appears to them, must needs be accorded also to the exclamations of mortal terror caused by a deadly assault. * * * To reject the evidence afforded by the agonized entreaties of one standing face to face with death in the person of a murderer with an uplifted weapon, when we would accept the account of the affair afterwards given by the enfeebled victim, with perceptions and recollections darkened and dimmed by the mists and shadows of approaching dissolution, would be, we think, but a bad sample of 'the perfection of human reason.' "

Upon a careful examination of the record we are convinced that the defendant was accorded a fair and impartial trial, and that the evidence complained of was properly admitted.

The judgment is affirmed.

DOYLE, P. J., and ARMSTRONG, J., concur.