**Rex R. MOORE, Jr., Appellant,**

v.

**STATE of Oklahoma, Appellee.**

No. F–86–403.

Court of Criminal Appeals of Oklahoma.

Aug. 29, 1988.

Rehearing Denied Oct. 11, 1988.

Frank R. Courbois, Fred L. Staggs, Oklahoma City, for appellant.

Robert H. Henry, Atty. Gen., M. Caroline Emerson, Asst. Atty. Gen., Oklahoma City, for appellee.

## OPINION

BUSSEY, Judge:

The appellant, Rex R. Moore, Jr., was tried by jury, and convicted in the District Court of Oklahoma County, Case No. CRF-85-2403, for the offense of Murder in the First Degree in violation of 21 O.S.1981, § 701.7 for the first count, and for the offense of Arson in the First Degree in violation of 21 O.S.1981, § 1401 for the second count. The jury returned a verdict of guilty for both offenses, and set punishment at life imprisonment on Count I and thirty-five (35) years imprisonment on Count II. From this judgment and sentence the appellant appeals.

On May 7, 1985, Tammy Lee Moore was severely burned while she was in her home. Two days later Tammy Moore died from complications arising from the severe burns. After an investigation, her husband, the appellant, was charged with her death.

The prosecution's case relied heavily on the dying declaration of Tammy Moore along with physical evidence taken from the scene. The appellant claimed Tammy Moore's death was a suicide.

The appellant, a geologist, met Tammy Moore, then Tammy Buerge, when she was fourteen years old. There was more than thirty years difference in their ages. They were married for almost nine years. During the oil boom of the late seventies the appellant earned a comfortable living. He supported his new wife through high school, college, and drama school. Tammy Moore soon became involved in local theatre. The couple had two children.

By 1985, after the marriage developed problems, the appellant and his wife had decided to get a divorce. The appellant accused his wife of embezzling funds from his oil exploration company. A property settlement was drawn and an agreement on child custody was reached. Tammy Moore would continue to be employed at her husband's business, but would lose custody of the children temporarily.

On May 6, the day before the fire, the appellant told a friend he was happy that he was going to have the children and that Tammy was going to continue at the office. He had also retrieved the company money that Tammy had taken, and he looked forward to a favorable settlement agreement on their divorce.

On the morning of May 7, some workmen saw the appellant leaving his house with his two children. According to the workmen, the appellant seemed normal. The appellant returned a short time later.

At approximately 10:00 a.m. the appellant ran to the back door and shouted to the workmen, "call the fire department and an ambulance." The workers ran into the house and were told by the appellant that his wife was in a second story bedroom which was on fire. The workmen and the appellant made efforts unsuccessfully to extinguish the fire. Shortly thereafter the fire department arrived and firemen proceeded immediately upstairs. Captain Barton and Fireman Edward Koch entered the burning room and found Tammy Moore draped over a couch.

Tammy Moore was taken by ambulance to the hospital. She had received 3rd degree burns over 95% of her body. The only part of her body not burned was a small area on the top of her head.

The appellant was also burned in the fire. He had received the burns prior to notifying the workmen. The appellant was taken by ambulance to the hospital where he received treatment for his burns. The appellant's burns were limited to his arms, chest and face.

Using a sketch of the involved section of the house, Deputy Chief Tom Smith testified at trial that the fire was confined to a suite of rooms including the west bedroom, a sitting room, bathroom, dressing room

and sun room. The fire involved the bedroom, the sitting room adjacent to the bedroom and the bathroom. Chief Smith testified that smoke from the fire traveled from the bedroom and sitting room through the bathroom and into other rooms of the bedroom complex. Burned bits of clothing were found in the bathroom next to the bathtub, which was more than two-thirds full of water. There was evidence that the tub had been used.

The most heavily burned area was in the sitting room where a gasoline can and a flammable liquid pattern were found on the floor. Tammy Moore was found in the bedroom lying across a couch near the foot of the bed. There was a flammable liquid pattern at the foot of the bed, and the bed was burned diagonally across the foot. There was smoke damage to other rooms within the bedroom complex. In the bathroom a partially burned man's shirt was found next to the tub, and soot from the fire covered the walls.

Entrance to the complex of rooms was through a single door leading from an interior hallway and into the sitting room. There were windows from the various rooms facing the exterior of the house, and one window in the sun room that could provide access to another bedroom, but testimony by investigators revealed that all the windows were locked. Deputy Chief Tom Smith testified that the window providing access to the other bedroom was closed.

Fire investigator John Soos related that there were two separate fires in the suite of rooms. One fire, the most intense, was in the sitting room near the gas can. The second fire was in the bedroom where Tammy Moore was found.

When Tammy Moore arrived at the local hospital, she was conscious and although unable to talk, responded to questions by gesturing and nodding her head yes or no. Initial interviews with Tammy Moore were conducted by Captain George Hale, who is an Oklahoma City Fire Department Arson investigator, and Oklahoma City Police Department Detectives. Medical personnel at the hospital, in particular the emergency room nurse, also communicated with Tammy Moore. Later, when Tammy was with relatives she outlined letters by using her finger to write on her bedsheets.

Testimony reveals that when Tammy was asked if she had tried to commit suicide she would shake her head no. When asked if the appellant had poured gasoline on her and set her on fire, Tammy Moore shook her head yes. The victim's ability to communicate began to decline as her condition worsened and on the morning of May 9, 1985, Tammy Moore died from complications arising from the severe burns.

I

Initially, the appellant contends that certain statements made by the victim constitute inadmissible hearsay. He asserts that the trial court erred in allowing the statements as evidence of the victim's state of mind. He argues that the statements were in reference to the appellant's prior actions and therefore did not reflect upon the crime for which he was charged and convicted. The appellant claims those statements denied him a fair trial.

■ The trial court correctly allowed extensive hearsay testimony under the state of mind exception, 12 O.S.1981, § 2803(3). Much of such testimony reflected Mrs. Moore's fear of her husband and that he could harm her. Such antecedent declarations by a decedent are admissible in a case of homicide to show the decedent's state of mind toward the defendant as well as providing a motive for the killing. *Stedman v. State*, 568 P.2d 350 (Okl.Cr.1977); *Sallee v. State*, 544 P.2d 902 (Okl.Cr.1975); *Spuehler v. State*, 709 P.2d 202 (Okl.Cr. 1985).

While the deceased's antecedent declarations are admissible to show his or her state of mind, declarations by the deceased referring to the defendant's past acts are inadmissible. *Wadley v. State*, 553 P.2d 520 (Okl.Cr.1976).

■ In the present case we agree with the appellant that testimony by the victim's father and a friend of the victim was improperly allowed. The act testified to oc-

curred approximately ten days prior to the incendiary fire. It involved a domestic disturbance between the appellant and his wife.

The father's testimony was that "[Tammy] had said that she and Rex had had an argument, and that Rex had gone to look for a gun, and that the police were called." The defense attorney made an appropriate hearsay objection that the court overruled.

The victim's friend testified that "she told me that there had been an incident over the weekend ... that she had hugged and kissed [a male friend] goodbye ... and that Rex confronted her, and was threatening violence ... [S]he went back into the house, and there was a gun and she was so afraid that he might do something to her that she hid the gun, and that he found it and pulled it on her." Subsequently defense counsel moved that the testimony be stricken based on the witness' generalization. Counsel's motion was overruled. Then counsel moved to strike the witness' impression of the victim's fear. The court overruled this objection as well.

This is the type of testimony that we have held inadmissible, *Wadley, supra.* The testimony should have been excluded. The rationale behind the exclusion of testimony about antecedent acts is that the declarant's state of mind is so intertwined with the act itself that only a superhuman effort can unravel the declarant's state of mind from the truth of the matter asserted in the act. *People v. Hamilton,* 55 Cal.2d 881, 13 Cal.Rptr. 649 (1961).

■ We find, however, that the evidence of the defendant's guilt is more than sufficient to find the appellant guilty beyond a reasonable doubt. Upon a careful reading of the record, noting the victim's dying declaration and reconstruction of the death scene by expert witnesses, we cannot say that there was a reasonable possibility that the evidence complained of might have contributed to the conviction. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The admission of the evidence we conclude was harmless error and appellant's assignment of error must fail. *Stedman v. State,* 568 P.2d 350 (Okl.

Cr.1977); *Schneble v. Florida,* 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972).

We would further note that defense counsel introduced testimony of a friend of the appellant rebutting the State's account of the incident. The friend testified that appellant told him that Tammy had called the police. She gave the gun to the police; however, the friend stated that the appellant did not even know the whereabouts of the gun.

Additionally, the trial court's jury instruction limiting evidence of other misconduct negated any prejudicial impact of the prior references to the domestic disturbance.

## II

■ The appellant contends that the trial court erred by admitting the dying declarations of Tamara Moore. We find that error did not occur and the court properly allowed the declarations under 12 O.S.1981, § 2804(B)(2). That section states: "In a prosecution for homicide ... a statement made by a declarant while believing that his death was imminent, concerning the cause or circumstances of what he believed to be his impending death" is admissible. The appellant asserts that Tamara Moore's declarations were inadequate as dying declarations because it was impossible to be certain that she knew she was communicating.

## A

The evidence reveals that the deceased received third degree burns over 95% of her body. Since her vocal cords had been burned, she was only able to communicate by nodding her head in the affirmative or negative, or through the use of gestures and writing.

The St. Anthony emergency room nurse testified that Mrs. Moore was alert and conscious. The nurse asked Mrs. Moore questions to ascertain if she knew where she was, who she was and that she had been burned. To these questions she nodded her head affirmatively. To the questions of whether she had taken pills or

attempted to commit suicide she nodded her head side to side indicating that she had not. The same day, after Mrs. Moore had been transferred to Baptist Hospital, Captain George Hale interviewed her. Hale, based upon Dr. Wile's prognosis, asked Mrs. Moore if she knew she was dying to which she nodded yes. He then asked her if she had attempted to commit suicide and she responded negatively. He then asked her if her husband had tried to kill her and she nodded yes.

Later that afternoon, Captain Hale returned with two Oklahoma City detectives. They informed Mrs. Moore that she was dying and she responded affirmatively to the questions of whether her husband had done this to her and whether he threw gas on her. She held up one finger in response to how many times her husband had hit her. Prior to her being taken to surgery one of the detectives attempted to ascertain her date of birth by reciting years, months and dates. Mrs. Moore responded by nodding her head. She correctly identified the year of 1960 and the month of April. As the detective was counting the days of the month Mrs. Moore incorrectly nodded her head at 25 rather than 28, her date of birth. At the end of the interview Mrs. Moore replied in the affirmative when asked if she fully understood the questions and whether she had told the truth.

The victim's parents, Mr. and Mrs. Buerge, visited her the next day and her mother related that she told Mrs. Moore that "everything's going to be okay" and not to worry. Mrs. Moore responded by shaking her head violently no. Thereafter, in response to her mother's question of what happened, she outlined on the sheets, spelling with her finger "Rex poured gas on me" and "I wrapped in a blanket."

The evidence is clear that the victim's statements consisted of non-verbal conduct intended as assertions and written assertions. It is evident that the victim was conscious and aware of her impending death. Dying declarations need not be spoken as long as the declarant has the mental capacity to realize her condition, understand the questions asked, and the purpose and effect of her answers. *Poling v. State*, 12 Okl.Cr. 27, 151 P. 895 (1915). In *Poling*, the defendant's wife's throat was cut with a razor, rendering her incapable of speech. Her husband's defense was that his wife had committed suicide. A witness testified that she asked the victim if she had done it to herself. Unable to speak, the victim nodded no. In response to the question regarding who had done it the victim pointed her finger at the defendant. In response to the question did he [the defendant] do it the victim nodded her head affirmatively. This Court stated that:

the fact that the deceased could not speak, and that in response to questions her answers were conveyed by nodding and shaking her head, and pointing her finger, forms no objection to the admissibility of the declarations, although communicated by signs instead of words, were competent, and the foundation for the admission of the same was sufficient ...

*Poling*, 151 P. at 899. Based upon the foregoing we find that the declarations of Tamara Moore were properly admitted as dying declarations.

## B

■ The appellant further asserts that the State denied him the right to interview Mrs. Moore in violation of his right to the confrontation of witnesses. We disagree since the confrontation clause does not apply to a hearsay declaration where the declarant is unavailable. *Newbury v. State*, 695 P.2d 531 (Okl.Cr.1985).

At trial, defense counsel revealed to the court at the bench that a police sergeant had denied his request to interview the victim. Defense counsel's private investigator, testifying at trial, corroborated counsel's account. Defense counsel fully cross-examined the five State witnesses who related the victim's dying declarations. Even assuming that the appellant was denied permission to interview Mrs. Moore, he has made no showing that he was prejudiced. *Broadway v. State*, 494 P.2d 331 (Okl.Cr.1972). Therefore we find appellant's assertion unavailing.

.

## C

■ Appellant further contends that the police chose not to videotape the victim's dying declarations and chose not to preserve any of the victim's handwritten notes.

There is no evidence to suggest that the police deliberately failed to videotape the victim's dying declarations or preserve notes. On cross-examination one of the police officers testified that a video camera was available but not used. The officer never expressed that he willingly failed to record the interview. We believe that it would have been preferable to have used a mechanical recording device; however, we are unable to delve into the reasons for not recording the interview. There is no duty to create evidence and a videotape, though corroborative, would have merely been cumulative to the witnesses' testimony.

Testimony by the victim's parents revealed that she had written in their presence on pieces of paper. Those pieces of paper were not preserved and therefore unavailable to either the State or defense.

Appellant has not shown bad faith by the police in failing to preserve evidence nor in the failure to videotape the victim's testimony. *Standridge v. State*, 701 P.2d 761 (Okl.Cr.1985). We therefore find this argument without merit.

## III

■ The appellant asserts that he was denied a fair trial by the introduction without objection of non-deathbed hearsay that the deceased denied attempting suicide. We first note that no objection was made and the assignment of error was waived by the appellant. *Johnson v. State*, 662 P.2d 687 (Okl.Cr.1983). Nevertheless, had objection been made, the declarant's statement would have been admissible since the emergency room nurse elicited the statement for the purpose of medical treatment and the statement properly constituted part of the victim's medical history. Responses elicited from the victim regarding attempted suicide were pertinent to her treatment. 12 O.S.1981, § 2803(4). We therefore find this assignment without merit.

## IV

■ The appellant next asserts that he was denied a fair trial by introduction of the State arson investigator's opinion on the ultimate issue in the case. We find that the testimony complained of was properly introduced as expert opinion, assisting the trier of fact as to the determination of the ultimate issue.

Title 12 O.S.1981, § 2704 provides: "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

The investigator, John Soos had twelve years experience in investigating arson cases. He reconstructed the fire scene noting that there were two different burn areas, one in the bedroom and another in the sitting room. He testified that a diagonal burn pattern on the bed indicated that gasoline had been poured on Mrs. Moore and that she had removed herself from the bed and fell onto a sofa in the bedroom. The lack of burn drips between the bedroom and the sitting room, and the condition of the bathroom, caused the investigator to conclude that: "Mr. Moore apparently had poured gasoline on his wife who was on the bed. She got up. He struggled with her and got gasoline on himself, ignited himself. She fell onto the sofa. He proceeded to the bathroom, turned on the shower, put himself out, went back, poured gasoline in this area from the doorway, ignited the fire, pulled the door to and went out." (Emphasis added). The present case is inapposite to *Gabus v. Harvey*, 678 P.2d 253 (Okla.1984), where the Oklahoma Supreme Court held that opinion testimony of a police officer investigating an automobile accident was inadmissible as to the ultimate issue of fault in a negligence case.

We are not faced with a situation where the normal experiences and qualifications of jurors permits them to draw the proper conclusions from the facts and circumstances. Fire investigation is a highly technical field and the opinion of Officer Soos reflected his expertise and was useful

to the trier of fact in determining the nature and extent of the fire. The fact that his testimony embraced the ultimate issue was not erroneous as it was relevant in assisting the trier of fact. Soos' hypothetical scenario, based on his investigation, was a logical deductive process based on his findings.

Defense counsel very capably attacked Investigator Soos' testimony and elicited from Soos and other witnesses that there was a window in the complex of rooms that could have provided an exit other than the door which Soos had posited. Defense counsel vigorously cross-examined Soos eliciting the testimony that people who are on fire have a tendency to run and that Mrs. Moore could have transferred the fire from the bedroom to the sitting room.

Defense counsel's thorough cross-examination negates the argument that the appellant was prejudiced by Captain Soos' testimony. The jury was allowed to weigh the testimony and as the ultimate judge of the facts to reject or accept the expert opinion. *See Riggle v. State*, 585 P.2d 1382 (Okl.Cr.1978); *Casady v. State*, 721 P.2d 1342 (Okl.Cr.1986).

### V

The appellant next argues that the trial court erred in suggesting to the jury that he had an obligation to call Dr. Jett as a witness. This contention arises out of an inadvertent remark made by the trial judge. Dr. Leslie Wiles read into evidence a portion of a discharge summary prepared by Dr. Mason Jett who did not testify at trial. Defense counsel objected on the basis of hearsay saying "we ought to put Dr. Jett on, if he intends to prove her alertness." The court inquired of the prosecutor and defense counsel if they were going to call Dr. Jett as a witness. The prosecutor replied that he would not and defense counsel replied, "I don't know." The judge's inadvertent remark did not amount to an improper comment on the defendant's failure to present defense witnesses. There has been no showing that the appellant was prejudiced by the judge's inquiry. Such a showing is a requirement for any claim of error. *Wofford v. State*, 581 P.2d 905 (Okl.Cr.1978).

### VI

The appellant next contends that the discharge summary prepared by Dr. Jett, Mrs. Moore's attending physician, was improperly admitted hearsay on hearsay. We agree to the extent that the discharge summary contained hearsay statements that related to other than the cause of death. The discharge summary, in this case, a death summary, in and of itself is a regularly kept record of the hospital. It was admissible for the purpose of relating the cause of death, under 12 O.S.1981, § 2803(6). However, the prosecutor introduced the record to prove that the victim was alert. The complained of portion in the record relates that: "As soon as sufficient fluid resuscitation was accomplished, however, she became quite mentally alert and was able to communicate by making letters with her right hand on the sheets of the bed. Both the patient and her family were informed of the seriousness of her burns and that survival was unprecedented. The patient made a last will and testament and was able to talk to fire investigators and police prior to her death." There is no evidence that Dr. Jett had directly observed or communicated any of the aforementioned statements. The discharge summary including the above excerpt of that summary was introduced through Dr. Leslie Wiles, the Baptist Hospital emergency room physician. The existence of hearsay within a medical record may be properly admitted when the hearsay is the basis for the preparing physician's diagnosis, evaluation or determination of cause of death. The hearsay contained therein may also be admissible as an exception to the hearsay rule. Here there is no exception that is applicable. A discharge summary not only contains relevant information as to the course of treatment but is also an abstract of the patient's chart and summaries prepared by other personnel. In this case the prosecutor should have called Dr. Jett to testify as to the non-diagnostic material in the discharge

summary, providing he could have identified the discharge summary and testified regarding the statements contained therein.

We disagree with the appellant in his assertion that the death summary contained information prepared for the purpose of litigation. He misapplies the case of *Horn v. Sturm*, 408 P.2d 541 (Okla. 1965), where it was held that since an autopsy report could be prompted with litigation in mind it should not be placed in the category of hospital records for evidentiary purpose.

There is no indication that the death summary was prepared for purposes of litigation. We find the discharge summary was a regularly kept hospital record. The purpose for which it was introduced required the testimony of Dr. Jett to assure the reliability of the statements contained therein. Therefore Dr. Jett should have testified as to those statements.

However, we find that the appellant was not prejudiced by the admission of the discharge summary as it was merely cumulative. Accordingly, we do not find this assignment of error warrants reversal.

### VII

■ Appellant contends he was denied effective assistance of counsel in violation of the Sixth Amendment to the United States Constitution. The appellant argues four bases of ineffective assistance of counsel: 1) failure to object to the arson investigators opinion as to the ultimate issue in the case; 2) failure to object to non-deathbed hearsay that the deceased denied attempting suicide; 3) failure to object and move for mistrial based upon evidentiary harpoons; and 4) failure to call witnesses for the defense.

The appellant's first and second grounds for ineffective assistance of counsel have been addressed in parts III and IV of this opinion. As we concluded, defense counsel did not err by failing to object so these assertions do not provide the grounds for ineffective assistance of counsel. Appellant asserts that counsel should have objected to an evidentiary harpoon allegedly launched by Fireman Koch. We have consistently held that unless objected to, evidentiary harpoons are waived and cannot be raised on appeal. *Webb v. State*, 586 P.2d 78 (Okl.Cr.1978); *Bruner v. State*, 612 P.2d 1375 (Okl.Cr.1980).

Although defense counsel did not object to the alleged evidentiary harpoon, he nevertheless impeached the witness from the preliminary hearing transcript. We have held that when viewed in the scope of counsel's total performance the mere presence of unobjected error is not decisive. *Harrall v. State*, 674 P.2d 581 (Okl.Cr. 1984); *Cotton v. State*, 679 P.2d 1305 (Okl. Cr.1984).

Finally, the appellant asserts that defense counsel's performance was deficient in that he did not call a private arson investigator to rebut the fire investigator's findings. It is also asserted that defense counsel should have called the attorney that prepared Tammy Moore's will to rebut the testimony of the hospital social worker.

■ The appellant based his motion for a new trial on the ground of newly discovered evidence on the arson investigator's findings and the attorney's affidavit. The trial court overruled the motion for a new trial. It is our opinion that the trial court did not err in overruling the motion for a new trial. The facts of the case point to the appellant's guilt beyond a reasonable doubt and there is no reasonable probability that the jury's verdict would have been otherwise. The testimony of the arson investigator and the attorney preparing the will would not have changed the result in view of the victim's dying declaration and corroborating evidence. *See Robison v. State*, 677 P.2d 1080 (Okl.Cr.1984).

Appellant has not shown that trial counsel failed to adequately investigate and prepare the case. There is no indication to the contrary that trial counsel's omission of the aforementioned testimony was other than the exercise of trial strategy. We conclude therefore that the appellant has failed to demonstrate that defense counsel committed unprofessional error that prejudiced his defense so that "there is a reasonable prob-

ability that, but for counsel's unprofessional error, the result of the proceeding would have been different." *Strickland,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed. 2d 674, 698 (1984). Accordingly, we find this assignment of error to be without merit.

## VIII

The appellant asserts that the trial court erred in overruling defense motions for an in camera hearing and failing to suppress the statements made by the appellant before he had been informed of his Constitutional Rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The record reflects that the appellant was neither in custody nor a suspect when he spoke with the firemen. Both custody and interrogation are necessary to invoke the requirements of *Miranda. Kreijanovsky v. State,* 706 P.2d 541 (Okl.Cr. 1985).

■■ We find from a reading of the record that the questioning of the appellant as to the nature of the fire without giving *Miranda* warnings was not improper since the questions were investigatory and not accusatory. *See Coleman v. State,* 668 P.2d 1126 (Okl.Cr.1983), *cert. denied,* 464 U.S. 1073, 104 S.Ct. 986, 79 L.Ed.2d 222 (1984). Captain Hale read the appellant his *Miranda* rights immediately after learning that the appellant was a suspect. We therefore conclude that the trial court did not err in overruling the defense motions for an in camera hearing.

## IX

The appellant further asserts that the court erred in allowing the introduction of evidence without first requiring the State to establish a proper chain of custody, and in allowing testimony of an officer who was not listed as a witness prior to trial. We find this contention without merit.

■■ The purpose of the chain of custody rule is to ensure that physical evidence has not been tampered with or altered. *Nelson v. State,* 687 P.2d 744 (Okl.Cr.1984). From a reading of the record, a proper chain of custody was established for all pieces of evidence. Appellant contends that nine cans containing evidence submitted to the O.S.B.I. by Captain Soos lacked a proper chain of custody. Soos testified that evidence is collected, placed in the cans, sealed and sent to the lab so that the evidence is not contaminated by any other material or flammable liquids. The items of evidence were collected directly by Soos, or by medical personnel, given to Captain Hale and then delivered to Soos; or in the case of the remains of Mrs. Moore's clothing, collected by nurse Randi Wenthold, given to police officers and then delivered to Soos. Although the trial record does not specify who delivered the cans to the O.S.B.I. laboratory, the preliminary hearing transcript indicates that after identifying and initialing the cans, Soos delivered the cans to Captain Hale who logged the evidence and transported the cans to the O.S.B.I. There is no evidence of tampering with the sealed containers and every indication is that reasonable precautions were taken to preserve the original condition. *See Driskell v. State,* 659 P.2d 343 (Okl.Cr.1983).

■■ Appellant also complains that the State did not establish a proper chain of custody regarding the victim's gastric contents. Nurse Wenthold testified to withdrawing the contents and giving them to some detectives. Richard Prouty, the forensic chemist receiving the contents, identified the detectives as officers Moore and Pacheco. Officers Moore and Pacheco did not testify at trial.

Appellant's allegation that there is a flaw in the chain of custody has some support, however, the chain was not so imperfect as to render the evidence inadmissible. *Billy v. State,* 602 P.2d 237 (Okl. Cr.1979). Failure to establish the complete chain of custody only goes to the weight of the evidence. It does not affect admissibility. *See Horn v. State,* 671 P.2d 1163 (Okl. Cr.1983). We therefore find that the trial court properly allowed the testimony of the forensic toxologist.

Appellant also asserts that there was no chain of custody established for a vial of

blood which tested type "O". The appellant seems to base his argument on the State's oral motion to endorse a police officer who transported the blood. Defense counsel objected to the officer's testimony. The officer's testimony only concerned the chain of custody and not the merits of the case. The appellant has not shown that he was prejudiced by the officer's testimony.

Appellant also claims that other exhibits were prejudicial and irrelevant. He fails to bolster his claim with either argument or authority, accordingly we dismiss his claim.

## X

Appellant contends that the court erred by refusing to grant instructions upon the lesser included offenses of Murder in the Second Degree and Arson in the Third Degree. He also contends that he was prejudiced by the court's failure to instruct on character evidence regarding the victim and failure to include a limiting instruction on state of mind.

There was no evidence to support instructions as to Second Degree Murder under 21 O.S.1981, § 701.8(1) or § 701.8(2). No evidence was presented to indicate that the appellant acted in any other manner except with premeditation to effect the homicide. *See Hill v. State*, 672 P.2d 308 (Okl.Cr.1983), *cert. denied*, 465 U.S. 1106, 104 S.Ct. 1609, 80 L.Ed.2d 138 (1984). Likewise there was no support for a Second Degree Felony Murder instruction as there was no indication that the victim's death was the result of the intentional burning of the home. *See Walker v. State*, 723 P.2d 273 (Okl.Cr.1986).

Similarly the appellant was not entitled to an instruction on Third Degree Arson under 21 O.S.1981, § 1403. The evidence at trial established the elements of First Degree Arson, under 21 O.S.1981, § 1401. The appellant through his statements to fire officials said that his wife had set herself on fire thereby denying that he had set the fire. He was either guilty of Arson in the First Degree or he was innocent. *See Case v. State*, 555 P.2d 619 (Okl.Cr.1976).

An instruction on character evidence as to the victim is unwarranted as the appellant did not assert a defense of self defense nor was there evidence suggesting that the victim possessed violent tendencies. *Harris v. State*, 400 P.2d 64 (Okl.Cr.1965). Appellant finally asserts that he was prejudiced by the lack of a limiting instruction on "state of mind" hearsay declarations made by the victim. Defense counsel did not request such an instruction. The court's final instruction adequately covered the weight to be given to testimony. The appellant has failed to show prejudice by the lack of a "state of mind" limiting instruction. We therefore find his assertion to be without merit.

## XI

The appellant next contends that his sentence was excessive. We disagree. The thirty-five year term for arson to run consecutively with the life sentence was within the statutory limit and we will not disturb the sentence on appeal. *Clark v. State*, 678 P.2d 1191 (Okl.Cr.1984). The appellant was also assessed a $10,000.00 victim's compensation assessment on each count. The appellant does not claim indigency or inability to pay the assessment nor hardship imposed on his dependents. There is no evidence to indicate that the sentencing judge considered any factors other than those set forth in 21 O.S.Supp. 1984, § 142.18(A). Appellant cites no authority that the order to repay the victim's father for funeral and burial expenses was excessive, contrary to law or an abuse of discretion. Consequently we find that the judge properly ordered restitution under the circumstances.

## XII

Appellant's last contention is that the court erred in overruling his motion to prevent death qualification of the jury. He argues that such qualification resulted in a jury more predisposed toward a finding of guilt. We reject this contention on two bases. First, we have held that a juror who is committed prior to trial, to vote against the death penalty may be properly

excused. *Dutton v. State,* 674 P.2d 1134 (Okl.Cr.1984); *VanWoundenberg v. State,* 720 P.2d 328 (Okl.Cr.1986); *See also, Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Secondly, the jury returned a sentence of life imprisonment and appellant has not offered any evidence that the jury selected was predisposed to a finding of guilt. *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).

Finding no error warranting reversal or modification, we AFFIRM the judgment and sentence.

BRETT, P.J., concurs.

PARKS, J., concurs in results.