**Michael Edward HOOPER, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

**No. F–95–835.**

Court of Criminal Appeals of Oklahoma.

Oct. 21, 1997.

Rehearing Denied Nov. 24, 1997.

Mitchell A. Lee, Muskogee, Richard Krogh, Lawrence, KS, for Defendant at trial.

Cathy Stocker, Michael S. Gahan, Assistant District Attorneys, El Reno, for State at trial.

James Drummond, Appellate Defense Counsel, Capital Direct Appeals Division, Oklahoma Indigent Defense System, Norman, for Appellant on appeal.

W.A. Drew Edmondson, Attorney General, Robert Whittaker, Assistant Attorney General, Oklahoma City, for Appellee on appeal.

## OPINION

CHAPEL, Presiding Judge.

Michael Edward Hooper was tried by a jury and convicted of three counts of Murder in the First Degree, in violation of 21 O.S. 1991, § 701.7(A), in the District Court of Canadian County, Case No. CF–93–601. On Counts I and III the jury found Hooper knowingly created a great risk of death to more than one person and probably would commit criminal acts of violence that would constitute a continuing threat to society; on Count II, that Hooper knowingly created a great risk of death to more than one person, probably would commit criminal acts of violence that would constitute a continuing threat to society, and committed the murder in order to avoid or prevent a lawful arrest or prosecution. In accordance with the

jury's recommendation, the Honorable Edward C. Cunningham sentenced Hooper to death on each count. Hooper has perfected his appeal of these convictions and sentences and raises sixteen propositions of error. After thorough consideration of the entire record before us on appeal including the original record, transcripts, briefs and exhibits of the parties, we find that neither reversal nor modification is required under the law and evidence. We affirm Hooper's Judgments and Sentences.

Hooper was convicted of killing his ex-girlfriend Cynthia Jarman [Cindy] and her two children, five-year-old Tonya and three-year-old Timmy. Hooper and Cindy met in 1992 and dated through the summer of 1993. On more than one occasion the couple fought and Cindy called police. At one point each had a victim's protective order against the other. Several times Hooper threatened to kill Cindy. In October or November, 1993, Cindy and her children moved in with Bill Stremlow. He told Cindy that Hooper was not welcome in their home. On December 6, 1993, Cindy told a friend she wanted to be with Hooper one last time and then stop seeing him.

Hooper bought a Smith & Wesson 9mm pistol on July 15, 1993. During a traffic stop the next day the Oklahoma City Police Department [OCPD] confiscated the gun. The OCPD returned the gun on October 23, 1993, but kept the ammunition. Hooper went target shooting with friends in fields northwest of Oklahoma City the day he bought the gun and after it was returned. He took the gun when he worked out-of-state in late October and November and refused a co-worker's offer to buy it. On December 6 or 7, 1993, Hooper showed a 9mm pistol to a neighbor.

On December 7, 1993, Cindy and her children drove Stremlow to work and borrowed his truck. Tonya got out of school at 3:30 p.m. Cindy was about fifteen minutes late to pick up Tonya; Tonya's teacher saw her get in Stremlow's truck next to a white male who was not Stremlow. Cindy failed to pick up Stremlow after work and he never saw her again; Cindy had Stremlow's only house key and he had to borrow his landlord's key to get in his house that night. Stremlow's

truck was found burning in a field in northwest Oklahoma City the night of December 7. He recovered it the next day. Accelerant, probably gasoline, had been used to set the truck on fire and the windows were broken out. Stremlow returned to his house December 10; although there were no signs of forced entry, a dresser drawer was disturbed, a Jim Beam whiskey bottle was on the dresser, and ten dollars in cash was missing. Hooper's fingerprints were on the Jim Beam bottle, and other evidence showed Hooper and Cindy drank that brand of whiskey.

Cindy and her children were reported missing on December 9. Police attempted to interview Hooper; he failed to come to the station and denied seeing Cindy for the past six months. Hooper appeared nervous and had a fresh scratch on his arm. Also on December 9, an area rancher noticed damage to his gate leading to a northwest Oklahoma City field. Inside the field he found broken glass, tire tracks, a bloody sock and a pool of blood. After hearing the missing persons report, the rancher contacted police. The next day police searched the field and found broken glass, tire tracks, a footprint, shell casings, a child's bloody sock, a pool of blood near a tree with a freshly broken branch, a blue fiber near the tree, and a grave site covered by limbs, leaves and debris. The grave appeared to be soaked with gasoline. Tonya, Timmy and Cindy were buried atop one another. Each victim had been shot twice in the head. There was a hole in the hood of Tonya's blue and purple jacket, and the white fiber lining protruded. A 9mm bullet pinned a white fiber to a branch on the grave. The branch appeared to have been broken from the tree near the pool of blood.

Police arrested Hooper and searched his parents' house. They found the 9mm pistol, two shovels with soil consistent with soil from the grave site, two gas cans, and broken glass consistent with glass found in Tonya's coat and near the gate. Police found a 9mm bullet in Hooper's pocket. His shoe print was similar to the footprint at the scene and DNA evidence showed blood on Hooper's shoes was consistent with Cindy's blood. Shell casings found where Hooper went tar-

get shooting matched bullets shot from his gun and casings found at the crime scene. In the past, Hooper and his ex-wife Stefanie Duncan had regularly visited the field where the bodies were found.

## PRETRIAL ISSUES

 Hooper argues in his first two propositions that the affidavits supporting the arrest and search warrants were insufficient, and the evidence seized through those warrants should have been suppressed. Hooper has waived review of all but plain error. He neither challenged his arrest nor moved to suppress evidence obtained as a result of his arrest. Failure to raise a timely objection to the legality of an arrest before entering a plea waives review.[1] Hooper also failed to move to quash the search warrant or suppress the evidence seized under the search warrant; nor did he object when that evidence was introduced at trial. On review, this Court will determine whether the magistrate had a substantial basis for concluding probable cause existed to believe Hooper committed the crimes, looking at the totality of the circumstances contained in the affidavits supporting the warrants.[2] A review of the affidavit as a whole may give sufficient reason to consider the information in the affidavit credible.[3] Affidavits are presumed valid. Where an affidavit is expressed in positive terms, a defendant may not go behind that language to show the officer did not have knowledge of the allegations set forth.[4] To challenge the substance of an affidavit Hooper must establish by a preponderance of the evidence that the affiant committed perjury or acted with reckless disregard for the truth.[5]

 In Proposition I Hooper alleges the arrest warrant was defective because the

facts set forth in the affidavit did not establish probable cause that he committed the crimes. On December 13, 1993, Canadian County issued a warrant for Hooper, and police arrested him at his parent's home. After the arrest, police seized Hooper's tennis shoes and a 9mm bullet found in his pocket, and photographed a scratch on Hooper's arm. The shoes were later compared to a footprint at the scene, and DNA testing determined blood on one shoe was probably Cindy's.

The affidavit accompanying the warrant includes the following information: (1) Hooper was arrested on July 16, 1993 for possession of a Smith & Wesson 9mm handgun, which was released to him on October 29, 1993 (while the OCPD Property Room retained the ammunition); (2) the victims' bodies dead of multiple gunshot wounds were discovered in a grave in Canadian County on December 12, 1993, and 9mm casings and a bullet were discovered near the grave; (3) the 9mm casings matched the casings from the OCPD property room; (4) Hooper was Cindy's ex-boyfriend and had been violent towards her; (5) Hooper, in the course of the missing persons investigation, declined to speak to officers on the advice of counsel;[6] and (6) on December 6 or 7, Hooper showed a witness a 9mm semi-automatic handgun.

Hooper first claims the magistrate could not have found this affidavit sufficient because it (a) neither includes the source of the allegations in item No. 4 nor indicates that the information was within the affiant's personal knowledge; (b) does not name the interviewing officers in item No. 5; and (c) neither alleges whether an informant existed nor indicates a record of reliability. A review of the entire affidavit shows these complaints are without merit. The affidavit begins by stating "the facts known to the

1. *Clayton v. State*, 840 P.2d 18, 28 (Okl.Cr.1992), *cert. denied*, 507 U.S. 1008, 113 S.Ct. 1655, 123 L.Ed.2d 275 (1993); *Raymer v. City of Tulsa*, 595 P.2d 810, 812 (Okl.Cr.1984).

2. *Langham v. State*, 787 P.2d 1279, 1281–82 (Okl.Cr.1990); *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

3. *Sockey v. State*, 676 P.2d 269, 270 (Okl.Cr. 1984).

4. *Martin v. State*, 804 P.2d 1143, 1145 (Okl.Cr. 1991); *Franks v. Delaware*, 438 U.S. 154, 172, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978).

5. *Martin*, 804 P.2d at 1145.

6. At trial the evidence that Hooper refused to talk on the advice of counsel was not admitted.

affiant", and thus on its face does not indicate that an informant gave the information to Officer Presley. Officer Presley's failure to name the interviewing officers alleged to have spoken to Hooper is not fatal, since the magistrate had a basis for determining the veracity and reliability of law enforcement officers. Taken as a whole, the affidavit provides enough information to form a substantial basis for probable cause. There is no plain error here.

 Hooper next complains that item No. 3 was incorrect in averring the site shell casings matched the property room casings, that the statement was reckless, and that Officer Presley knew or should have known the statement was false since the OCPD bullets had not been fired and thus had no casings to compare. Hooper does not establish that Officer Presley either committed perjury or acted with a reckless disregard for the truth. He suggests that Officer Presley must have known there could be no forensic match with the bullets in the Oklahoma City Police Department property room because those bullets had not been fired. No evidence supports this assertion. The record before us shows the casings found at the scene were compared with casings found where Hooper practiced target shooting, and, later, with a casing from a bullet the examiner fired from Hooper's gun. Hooper claims that the live rounds in the property room could not have matched any casings, because the live rounds could not have had extractor marks to compare with marks on the casings. Nothing in the record supports this assertion. Officer Presley set forth facts he believed true. At best this shows Officer Presley made a good faith mistake acting on reliable information. Hooper's assertion that Presley must have known the casings had not been matched to Hooper's gun does not establish perjury or reckless disregard. Given all the circumstances set forth in the affidavit including the veracity and basis of knowledge of the person supplying hearsay information, the magistrate had a substantial basis for concluding there was probable cause for

Hooper's arrest.[7] We find no plain error in the magistrate's failure to suppress the evidence from Hooper's arrest, and this proposition is denied.

In Proposition II Hooper argues the search warrant was defective. Officers served a search warrant at the same time Hooper was arrested, and seized items including Hooper's 9mm pistol, two shovels, gas cans, and broken glass. Oklahoma County issued the warrant with a separate affidavit from Officer Presley. Reviewing the affidavit under the totality of the circumstances test, we find the magistrate did not commit plain error.[8]

 Hooper claims a) that the affidavit does not provide indicia of reliability for either informant allegations or forensic conclusions, b) that the affidavit contains irrelevant evidence, c) that the information regarding forensic comparison was questionable, and d) that each individual charge in the warrant is insufficient to support probable cause. The affidavit initially avers that Officer Presley had personal knowledge of the facts and circumstances related through his own investigation as well as that of other officers named in the affidavit who told him their findings. This statement provides sufficient indicia of reliability and personal knowledge, as the magistrate had a basis for determining the veracity and reliability of law enforcement officers. All informants are named and their relationship to Hooper is described, so Hooper's first argument must fail.[9] Although Hooper claims the evidence of Stremlow's house burglary is irrelevant, that evidence further connects Hooper to the victims. Hooper again argues the forensic evidence was questionable because the bullets in the OCPD property room were never fired and thus casings could not be compared. The record does not support this assertion. Presley apparently recited information given to him by reliable sources and which he believed to be true. Given the totality of circumstances in the affidavit the magistrate did not err in admitting evidence

7. *Langham,* 787 P.2d at 1281.

8. *Langham,* 787 P.2d at 1281.

9. *Newton v. State,* 824 P.2d 391, 393 (Okl.Cr. 1991).

seized pursuant to the search warrant. There is no plain error and this proposition should be denied.

## ISSUES RELATING TO GUILT OR INNOCENCE

■ In Proposition III Hooper argues the trial court improperly admitted three separate categories of evidence he claims contain other crimes or bad acts. Hooper objected to some of this evidence, preserving some issues for appeal. A defendant should be convicted, if at all, by evidence of the charged offenses, but other crimes evidence may be admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.[10] The evidence was offered to show identity, continuous possession of the murder weapon, and motive or intent. Any errors in admission of this evidence do not require reversal or modification.

■ In Subproposition A Hooper complains about admission of evidence derived from a July 16, 1993 traffic stop. Hooper bought a 9mm pistol on July 15, 1993. On July 16, Officer Reagor arrested Hooper for an invalid inspection sticker and stolen license tags. Reagor confiscated the gun, which was returned to Hooper on October 29. Cindy was with Hooper during the traffic stop and a bottle of Jim Beam was in the car. The State filed a *Burks* notice and offered this evidence to show identification and to prove Hooper had continuous and exclusive possession of the gun. The trial court overruled Hooper's motion in limine to prevent this evidence three times before the evidence was presented; the court ruled possession of the loaded murder weapon was relevant to intent, ownership and possession, and that the probative value of that evidence outweighed its prejudicial effect. Hooper was granted a continuing objection to Officer Reagor's testimony and all evidence of the traffic stop.

At an *in camera* hearing the trial court found the stop was valid, then ruled Hooper's

possession of the murder weapon was relevant and the Jim Beam bottle went to identification because it corroborated other testimony that Hooper drank Jim Beam. The court held that the reason for the stop—the inspection sticker and stolen tags—and whether the whiskey bottle was open were not relevant to this case. Officer Reagor testified that he stopped Hooper and confiscated the loaded gun, that Cindy was in the car, and that there was a Jim Beam bottle.

Hooper argues this evidence interjected evidence of other crimes and bad acts and was more prejudicial than probative. He complains that the evidence was not necessary to show continuous, exclusive possession. On the contrary, the trial court correctly found that Hooper's possession of the murder weapon was relevant to the crime and necessary to complete the State's proof that Hooper possessed the gun continuously since its purchase, exclusive of the time in which it was confiscated. Hooper complains that the evidence did not establish a modus operandi or peculiar facts which would create a signature. This requirement goes specifically to other crimes evidence offered to prove knowledge and intent, and does not apply to the evidence here.[11] Hooper claims that the evidence was not necessary to show his connection with Cindy, and the fact the loaded gun was found under her seat gave the evidence a sinister overtone. Hooper also claims the evidence of the Jim Beam bottle was irrelevant and inferred prior bad acts. Since no evidence was presented on the topic, he argues the jury must have inferred the bottle was open. We find no error in inferences apparent only to defense counsel. Hooper also argues the trial court erred in admitting the Jim Beam bottle when the State originally only offered testimony about the gun. Other evidence showed that Cindy and Hooper drank Jim Beam whiskey, that after the crimes Hooper's fingerprints were found on a Jim Beam bottle in Stremlow's house, and that Hooper was not welcome at Stremlow's house. Evidence of the

**10.** *Burks v. State,* 594 P.2d 771 (Okl.Cr.1979), *overruled in part on other grounds by Jones v. State,* 772 P.2d 922 (Okl.Cr.1989); 12 O.S.1991, § 2404(B).

**11.** *Blakely v. State,* 841 P.2d 1156, 1159 (Okl.Cr. 1992).

Jim Beam bottle was relevant to corroborate other evidence and connect Hooper to the victims near the time of the crime. The trial court did not abuse its discretion in admitting this evidence.

■■■ Hooper now complains that the jury never heard why he was stopped, inferring trial counsel erred in agreeing to establish the validity of the stop outside the presence of the jurors.[12] He argues that no reasonable juror would believe that Hooper was stopped for an inspection sticker violation, so the omission of that evidence left a worse impression than if the evidence of the other crime had been admitted. Strictly speaking, Hooper wants this Court to rule the trial court erred in excluding evidence of other crimes. We decline; the evidence of the inspection sticker and stolen license tags was not relevant to this case.

■■■ Hooper argues in Subproposition B that the trial court erred in admitting Stefanie Duncan's testimony about her relationship with Hooper. In the first stage Duncan, Hooper's ex-wife, testified that in 1989 she and Hooper often went to the field where the victims were found. Before Duncan's testimony Hooper objected to any evidence of bad acts, and the prosecutor stated Duncan would only testify about the location of the field. On cross-examination, Hooper brought out that the two had only been married for eight months. When he asked about the grounds for divorce Duncan replied the couple had a violent history. Hooper ceased questioning and the State declined redirect examination. Then Hooper reopened cross-examination to ask who filed for divorce. Duncan replied Hooper had filed. On redirect, Hooper objected when the State asked who in the relationship had been violent. The trial court allowed the answer, ruling that Hooper had opened the door to this

testimony by implying that Duncan had been violent. Duncan testified Hooper had physically abused her and tried to kill her several times.

■■■ Hooper invited this error when he left the clear and erroneous impression that Duncan's violent behavior caused Hooper to file for divorce. Hooper is not entitled to relief from this invited error.[13] Hooper attempts to avoid this result by characterizing Duncan's testimony as an evidentiary harpoon. Evidentiary harpoons are typically delivered by experienced police officers, and are voluntary, willful injections of other crimes calculated to prejudice the defendant and which do actually prejudice him.[14] A witness other than an experienced police officer may occasionally deliver an evidentiary harpoon, but Duncan's evidence does not qualify. Her testimony was delivered in direct response to questioning; defense questions prompted it; and it was neither calculated to prejudice Hooper nor did it actually prejudice him given the other evidence against him.[15] The trial court did not err in admitting this testimony.

■■■ Hooper argues counsel's questions to Duncan amounted to ineffective assistance of counsel. Hooper must show counsel's performance was so deficient he did not have counsel as guaranteed by the Sixth Amendment, and his defense was prejudiced as a result of counsel's deficient performance by errors so serious as to deprive him of a fair trial with reliable results.[16] This Court need not reach the first prong of this test as Hooper fails to meet the second prong. The record suggests counsel attempted to show Duncan was violent and biased against Hooper, a reasonable strategic decision. Hooper fails to show that counsel's questions prejudiced him. Hooper also claims that the prosecutor committed misconduct when she re-

---

12. Hooper does not include this allegation in his proposition claiming ineffective assistance of trial counsel.

13. *Pierce v. State*, 786 P.2d 1255, 1259 (Okl.Cr. 1990).

14. *Bruner v. State*, 612 P.2d 1375, 1378 (Okl.Cr. 1980). Even an actual evidentiary harpoon may not be prejudicial if a defendant invites the error.

*Rogers v. State*, 890 P.2d 959, 972 (Okl.Cr.), *cert. denied*, —— U.S. ——, 116 S.Ct. 312, 133 L.Ed.2d 215 (1995).

15. *Bruner*, 612 P.2d at 1378–79.

16. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984).

peated Duncan's evidence and commented on Hooper's history and capacity for violence towards women. Hooper did not object to this comment and has waived all but plain error. There was no error as this was a reasonable comment on the evidence presented at trial.

Hooper argues in Subproposition C that the trial court erred in admitting evidence that Stremlow's house was burglarized after the murders. Stremlow and Officer Harlow testified that Stremlow spent the night at home on December 7, left, and returned to his house on December 10. Although there was no forced entry, dresser drawers were disturbed, ten dollars was missing, and a Jim Beam bottle bearing Hooper's fingerprints was on the dresser. Stremlow had told Cindy not to let Hooper visit their house. Stremlow had his landlord's key. The only other house key had been on his key ring with the truck key and was missing. The State filed a second *Burks* notice offering this evidence to prove identity. Hooper objected vigorously to this evidence and has preserved the issue for review. The trial court ruled evidence of the burglary was relevant to show date, time and location.

· Hooper argues since Stremlow spent one night at home before discovering the burglary, the bottle could not have been there before Cindy's death. He claims this evidence has no probative value and was only offered to show his bad character. While this testimony inferred Hooper committed burglary, it connected Hooper to the victims and the location. His fingerprints suggested that Hooper had been in the house, and the absence of evidence of forced entry suggested that whoever entered used the key from the truck key ring. The trial court did not err in admitting this evidence.

Despite Hooper's claim, the trial court did not err in admitting evidence of the July 16, 1993 traffic stop or the burglary at Stremlow's house. Additionally, Hooper opened the door to Duncan's comments about their

relationship and he is not entitled to relief on that ground. Proposition III is denied.

In Proposition IV Hooper argues the trial court erred in admitting portions of Brett Blanton's testimony. Hooper claims Blanton's comments were irrelevant under 12 O.S.1991, § 2402, and, if relevant, were more prejudicial than probative. Brett Blanton worked with Hooper during the autumn of 1993, and they shared a room when working in Illinois. Blanton testified that Hooper had a 9mm semiautomatic pistol, often went target shooting, cleaned the gun often, and slept with it nearby. Once Hooper fell asleep holding the loaded gun and Blanton had to take it away. Hooper refused Blanton's offers to buy the pistol. Hooper was granted a continuing objection to this evidence. The State offered it to show continuous and exclusive possession of the pistol and to negate the argument that Hooper might have loaned his gun to someone else who committed the murders. The trial court allowed limited testimony for that purpose. Hooper argues this could have been achieved without admitting evidence that he constantly held the gun and slept with it nearby. He suggests that, taken as a whole, Blanton's testimony showed Hooper was obsessed with his gun and that the testimony was offered to attack his character.

Relevant evidence is that which has any tendency to make more or less probable a material fact in issue.[17] The admissibility of evidence is within the trial court's discretion and this Court will not disturb that decision absent a clear showing of abuse.[18] Relevancy depends on the issues to be proved at trial.[19] The State's case against Hooper was entirely circumstantial, and the State had to prove Hooper used the 9mm pistol to commit the crimes. Blanton's evidence established that Hooper possessed the gun from October 29 through November, was very attached to it, and refused to sell it. This is relevant to the issues of possession of the murder weapon and Hooper's identity as

17. 12 O.S.1991, § 2401.

18. *Robedeaux v. State*, 866 P.2d 417, 432 (Okl.Cr. 1993), *cert. denied*, 513 U.S. 833, 115 S.Ct. 110, 130 L.Ed.2d 57 (1994).

19. *Hawkins v. State*, 891 P.2d 586, 593 (Okl.Cr. 1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 480, 133 L.Ed.2d 408 (1995).

**1102**

the murderer. Any inference that Hooper was obsessed with the pistol cannot have prejudiced him in light of the evidence of his violent history with Cindy and other evidence showing he was at the crime scene. Hooper has not shown that the prejudicial effect of Blanton's testimony substantially outweighs its probative value.[20] This proposition is denied.

In Proposition XIII Hooper claims the trial court erred in admitting hearsay evidence about a previous fight with Cindy. Two police officers testified about conversations with Cindy and Hooper after the two fought on February 19, 1992. Hooper objected to this evidence and has preserved the issue for review. Any error in admission of this evidence was harmless.

 Officer Abrahamson testified that Cindy reported a February 19, 1992 fight during which Hooper pulled the phone out of the wall, pushed and choked her, and threatened to kill her. Officer Abrahamson said Cindy appeared angry and upset. The trial court admitted this evidence as an excited utterance to show Cindy's state of mind.[21] A victim's hearsay statements describing threats and beatings are admissible to show the victim's state of mind and indicate fear of a defendant.[22] This Court has distinguished between statements describing a victim's state of mind and declarations of a defendant's previous bad acts.[23] We have held evidence of prior threats, assaults, and battery on a victim is proper to show the victim's state of mind,[24] but a specific description of a defendant's actions in grabbing a gun is inadmissible as a declaration of a defendant's actions.[25] Officer Abrahamson's evidence that Cindy told her Hooper pulled

the phone cord from the wall appears to be inadmissible evidence of Hooper's actions, but its admission is harmless in light of the properly admitted evidence against Hooper. Officer Abrahamson's testimony about the fight and Hooper's threats was properly admitted under the state-of-mind exception. Hooper also argues that no hearsay exception applies because this statement was offered to prove the truth of the matter asserted. The record does not support this claim. The trial court did not err in admitting this evidence.

 While investigating the February 19 fight, Officer Wilson called Hooper at the telephone number listed for Hooper in the police report. A person identifying himself as Hooper returned Officer Wilson's call, and told Officer Wilson he and Cindy fought on February 19 and he pushed her and put his hands around her throat. Hooper claims Officer Wilson should not have testified about this call. He agrees this conversation was not hearsay if he made the statements,[26] but claims it was not properly authenticated. Authentication may be proved by direct or circumstantial evidence, and is sufficient if evidence supports a finding that the matter in question is what its proponent claims it to be.[27] A voice may be identified and authenticated if the witness's opinion is based on hearing the voice at any time under circumstances connecting it with the alleged speaker.[28] A telephone conversation may be authenticated by evidence that a call was made to the number assigned to a particular person if circumstances including self-identification show the person answering to be the one

**20.** 12 O.S.1991, § 2403.

**21.** 12 O.S.1991, § 2803(3).

**22.** *Long v. State*, 883 P.2d 167, 173 (Okl.Cr. 1994); *Lamb v. State*, 767 P.2d 887, 890 (Okl.Cr. 1988); *Moore v. State*, 761 P.2d 866, 870 (1988); see also *Shepard v. United States*, 290 U.S. 96, 54 S.Ct. 22, 78 L.Ed. 196 (1933) (statement erroneously admitted as dying declaration not admissible for state of mind where statement did not present the victim's past or present thoughts or feelings but simply accused the defendant of murder).

**23.** *Moss v. State*, 888 P.2d 509, 518 (Okl.Cr. 1994); *Moore*, 761 P.2d at 870.

**24.** *Lamb*, 767 P.2d at 890.

**25.** *Moore*, 761 P.2d at 870.

**26.** 12 O.S.1991, § 2801(4)(B)(1).

**27.** 12 O.S.1991, § 2901(A); *Hightower v. State*, 672 P.2d 671, 676 (Okl.Cr.1983).

**28.** 12 O.S.1991, § 2901(B)(5).

called.[29] Officer Wilson called Hooper's number and asked Hooper to call him. A person identifying himself as Hooper called back and discussed details of the February 19 incident which Officer Wilson had not revealed. This conversation was sufficiently authenticated, and the trial court did not err in admitting the evidence. This proposition is denied.

■ In Proposition XVI Hooper claims the State failed to produce sufficient evidence linking him to the murders. When reviewing a claim of insufficient evidence this Court will ask whether, in the light most favorable to the State, the evidence could allow any reasonable trier of fact to find all the elements of the offenses beyond a reasonable doubt.[30] Hooper first assumes the Court has agreed with his other claims of error. He asserts that without evidence from the arrest, the search, the photographs, and other evidence of which he complains, insufficient evidence supports his conviction. As Hooper's other claims of error fail, this claim fails as well.

■ Additionally, Hooper argues that the evidence presented at trial is insufficient. He suggests the DNA evidence was ambiguous and the physical evidence cannot be connected in time with the murders. He claims he could not have committed the crimes in the time available, and states it is impossible to connect him with the State's theory of Tonya's death (see Proposition V, *infra*). Hooper is mistaken. The State's case against him was entirely circumstantial, so the evidence must exclude every reasonable hypothesis except guilt.[31] On review, this Court will accept all reasonable inferences and credibility choices which tend to support the jury's verdict.[32] Circumstantial evidence connecting Hooper to the murders includes:

- Hooper's relationship with Cindy was marked by physical violence and death threats in the two years preceding the murders;

- although Cindy left Hooper in the autumn of 1993, on December 6 she told a friend she wanted to be with Hooper one last time;

- at approximately 3:45 p.m. December 7 Cindy and Tonya were seen in Stremlow's pickup with a white male other than Stremlow;

- the driver and passenger windows in Stremlow's truck were broken in the field near the grave;

- broken window glass on Hooper's carpet was consistent with glass in Tonya's jacket pocket;

- broken window glass consistent with glass from Stremlow's truck was found near the crime scene;

- Hooper's shoeprints were similar to a footprint found near the broken gate at the crime scene field;

- DNA evidence showed blood on Hooper's left and right shoes was consistent with Cindy's;

- the victims were buried in a single grave which was saturated with gasoline;

- soil on shovels in Hooper's garage matched the composition of soil from the grave;

- the grave was in a wooded area, covered with branches and debris, in a field where Hooper had been before;

- on December 9 officers saw a fresh scratch on Hooper's arm;

- 9mm casings were found in the field, and a 9mm bullet was embedded in a branch on the grave;

- the three victims were each shot twice, and the wounds were consistent with a 9mm bullet;

- Hooper owned a 9mm pistol and evidence showed that either the Oklahoma City police or Hooper had exclusive possession of the pistol since its July 15, 1993, purchase;

29. 12 O.S.1991, § 2901(B)(6).

30. *Spuehler v. State*, 709 P.2d 202 (Okl.Cr.1985); *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

31. *Bryan v. State*, 935 P.2d 338, 358 (Okl.Cr. 1997); *Mayes v. State*, 887 P.2d 1288, 1301–02

(Okl.Cr.1994), *cert. denied*, 513 U.S. 1194, 115 S.Ct. 1260, 131 L.Ed.2d 140 (1995).

32. *Bryan*, 935 P.2d at 358; *Maxwell v. State*, 742 P.2d 1165, 1169 (Okl.Cr.1987).

- on December 6 or 7, Hooper showed neighbors a 9mm pistol;

- Hooper had a live 9mm bullet in his pocket when he was arrested;

- shell casings from the scene matched casings found where Hooper practiced target shooting and also matched a bullet test-fired from Hooper's gun;

- the 9mm bullet embedded in the branch on the grave was fired from Hooper's gun;

- white fibers consistent with Tonya's jacket were pinned to the branch on the grave by the 9mm bullet from Hooper's gun;

- the branch on the grave appeared to come from a limb near a pool of blood;

- DNA evidence showed the blood pool was consistent with Cindy or Tonya;

- blue fibers consistent with Tonya's jacket were near the blood pool;

- a small, hot object made a hole through the outer blue fabric and white fiber lining of Tonya's hood;

- after December 7, a person entered Stremlow's home without forced entry, and the only key to the home was on the truck key ring;

- after December 7 Hooper's fingerprints were found on a Jim Beam bottle left on Stremlow's and Cindy's dresser.

This evidence is inconsistent with innocence and excludes every reasonable hypothesis except that of guilt. This proposition is denied.

## SENTENCING ISSUES

In Proposition VII Hooper attacks the content of the victim impact evidence admitted during the second stage of trial. Cindy's sister and mother and the children's paternal grandmother testified about the effect the deaths had on their lives and the life of the children's father.[33] They said Hooper should receive the death sentence. The testimony was in a question-and-answer format and Hooper declined cross-examination. Hooper first contends the statute is unconstitutional, then argues the victim impact evidence in his case was too emotional and did not meet the statutory requirements as interpreted by this Court. He objected generally to victim impact evidence, but did not object specifically to the testimony at trial and has waived all but plain error.[34]

Hooper admits we have held 21 O.S.Supp.1992, § 984, constitutional,[35] but urges the Court to reconsider. In *Cargle* this Court rejected the argument that victim impact evidence acts as a "super" aggravating circumstance.[36] *Cargle* and our subsequent decisions sufficiently limit the purpose and presentation of victim impact evidence. The statute is not overbroad on its face or as applied here.

Victim impact evidence is intended to provide a "quick glimpse" of a victim's characteristics and the effect of the victim's death on survivors.[37] Evidence should be restricted to the financial, emotional, psychological, and physical effect of the crime itself and some personal characteristics of the victim.[38] Trial courts should beware in admitting evidence which focuses on the emotional impact of the crime to the exclusion of other

**33.** Hooper does not raise as a proposition of error the paternal grandmother's qualifications as a witness under 22 O.S.Supp.1992, § 984(2).

**34.** During the motions hearing, Hooper requested an *in camera* hearing before the evidence was admitted. In *Mitchell v. State*, 884 P.2d 1186, 1204 (Okl.Cr.1994), *cert. denied*, — U.S. —, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995), we held that victim impact evidence should be independently weighed before admission like any other evidence to ensure it is more probative than prejudicial. Although all parties were aware of

*Mitchell,* the trial court denied this request and Hooper did not renew the request at trial.

**35.** *Hain v. State*, 919 P.2d 1130, 1144 (Okl.Cr. 1996); *Cargle v. State*, 909 P.2d 806 (Okl.Cr. 1995); *Mitchell*, 884 P.2d at 1203–1204 (admission of victim impact evidence does not violate prohibition against ex post facto laws).

**36.** *Cargle*, 909 P.2d at 828 n. 15.

**37.** *Cargle*, 909 P.2d at 828.

**38.** 22 O.S.Supp.1993, § 984.; *Cargle*, 909 P.2d at 828.

factors;[39] "the more a jury is exposed to the emotional aspects of a victim's death, the less likely their verdict will be a 'reasoned moral response'".[40] Hooper argues the witnesses should not have been allowed to give their opinion that Hooper should be sentenced to death. This Court has recently held that victim impact witnesses may recommend a sentence.[41] A witness's opinion "should be given as a straight-forward, concise response to a question asking what the recommendation is; or a short statement of recommendation in a written statement, without amplification."[42] We will review such statements with a heightened degree of scrutiny,[43] but opinion evidence recommending a penalty is admissible under § 984.

Three witnesses gave victim impact evidence. Hooper complains about Barbara Jarman's testimony. He first argues that Mrs. Jarman's statement exceeds the statutory framework of admissible evidence because it focuses on the emotional impact of the children's deaths to the exclusion of other factors. Mrs. Jarman's statement describes the emotional effect the children's deaths had on her and her son, but also describes the physical and psychological effects. Taken as a whole, the testimony is within the bounds of admissible evidence, and its focus on emotion does not so skew the presentation as to divert the jury from its duty to reach a reasoned moral response.

■ Hooper claims the weighing process was skewed when Mrs. Jarman repeated the State's theory of Tonya's death. Mrs. Jarman said Hooper should be sentenced to death, and said she saw Tonya running through the woods, being chased and caught, and saw someone looking into Tonya's big, beautiful brown eyes before shooting her in the face and leaving her to die. This statement was not a "straightforward concise response" and should not have been admitted. However, we cannot say its admission had such a prejudicial effect as to prevent the

jury from making a reasoned moral decision whether to impose the death penalty. Hooper claims his sentence is unreliable because the prosecutor and Mrs. Jarman swayed the jury's passions by describing a scene unsupported by the evidence. The State's theory of Tonya's death was a reasonable deduction from the evidence at trial [see Proposition V, *infra*]. While Mrs. Jarman's recommendation was inappropriate opinion evidence, it was not based on an inaccurate and unsupported account of the crimes. Nothing in the record suggests Mrs. Jarman or the prosecutor intended to impermissibly influence jurors and skew the weighing process.

■ Hooper finally argues that admission of victim impact evidence is irrelevant to the ultimate issue to be decided. The legislature has determined that victim impact evidence is both relevant and admissible.[44] Hooper claims this Court should review the issue for more than plain error, even though he did not object to the evidence at trial. He argues that any objection to victim impact evidence would alienate the jury, and counsel had to choose between annoying the sentencer and preserving issues for appeal. The trial court instructed the jury to disregard objections and conferences at the bench, and counsel in closing asked the jury not to blame Hooper if counsel had done something the jury didn't like. Nothing in the record suggests this jury could not separate counsel's trial conduct from the issues it had to decide.

Oklahoma's statute allowing presentation of victim impact evidence is constitutional. While a small portion of the victim impact testimony was overly emotional and prejudicial, its admission did not prevent the jury from fulfilling its function and was harmless in light of the other evidence presented in the second stage of trial. This proposition is denied.

**39.** *Cargle,* 909 P.2d at 830.

**40.** *Conover v. State,* 933 P.2d 904, 921 (Okl.Cr. 1997)

**41.** *Ledbetter v. State,* 933 P.2d 880, 890–91 (Okl. Cr.1997); *Conover,* 933 P.2d at 920–21.

**42.** *Ledbetter,* 933 P.2d at 891.

**43.** *Id.; Conover,* 933 P.2d at 921.

**44.** 22 O.S.Supp.1993, §§ 984 et seq.

■ In Proposition VIII Hooper a) argues the great risk of death to more than one person aggravating circumstance is unconstitutional on its face and as construed by this court, and b) claims evidence in the record is insufficient to establish this circumstance. The jury found as to all three victims that Hooper had knowingly created a great risk of death to more than one person.[45] Hooper claims this aggravating circumstance performs no narrowing function because it applies whenever a defendant commits multiple murders. "The fundamental question on review is whether the aggravating circumstance, as construed, genuinely narrows the class of persons eligible for the death penalty. Constitutional infirmity does not arise merely because the aggravating circumstance is not subject to mechanical application, or because a wide range of circumstances satisfies it." [46] Hooper argues this circumstance does not apply simply because a defendant kills more than one person at a time. He cites cases in which this Court has held the great risk of death aggravating circumstance is proved not by the death of more than one person, but by a defendant's acts which create a risk of death to another "in close proximity, in terms of time, location, and intent" to the killing.[47] These cases do not support Hooper's argument. They imply that the aggravating circumstance is appropriate in this situation but hold that it may be appropriate where only one person is killed or where more than one person is killed but the murders are not contemporaneous. Hooper admits this Court has repeatedly held this aggravating circumstance applies where a defendant contemporaneously kills more than one person.[48]

■ On review, this Court will consider whether, in the light most favorable to the State, the evidence is sufficient to support the alleged aggravating circumstance.[49] Tonya and her mother were last seen together at approximately 3:45 p.m. on December 7. All three victims were found buried in a single grave, and each had suffered two gunshot wounds to the head. All three victims were in Stremlow's truck that morning, and the passenger windows on that truck appeared to be broken in the field near the grave. The jury could conclude the victims were together when they were killed. Evidence sufficiently suggests the murders were in close proximity. The aggravating circumstance of great risk of death is constitutional and supported by the evidence in this case. This proposition is denied.

■ In Proposition XI Hooper argues the murder committed for the purpose of avoiding or preventing a lawful arrest or prosecution aggravating circumstance [50] was not supported by the evidence beyond a reasonable doubt. The jury found that Tonya's murder was committed for the purpose of avoiding arrest or prosecution, on the grounds that Hooper killed Tonya because she saw him kill her mother. Hooper argues that insufficient evidence supports this finding since it appears to rely on the State's theory of Tonya's death (see Proposition V, *infra* ) and other speculative evidence. The avoiding arrest aggravating circumstance requires a predicate crime for which a defendant seeks to avoid arrest or prosecution, separate from the murder with which he is charged.[51] Evidence supports a finding that

**45.** 21 O.S.1991, § 701.12(2).

**46.** *Allen v. State*, 923 P.2d 613, 622 (Okl.Cr. 1996).

**47.** *Allen*, 923 P.2d at 622; *Snow v. State*, 876 P.2d 291, 297 (Okl.Cr.1994), *cert. denied*, 513 U.S. 1179, 115 S.Ct. 1165, 130 L.Ed.2d 1120 (1995); *Pennington v. State*, 913 P.2d 1356, 1370 (Okl.Cr.1995), *cert. denied*, — U.S. —, 117 S.Ct. 121, 136 L.Ed.2d 72 (1996).

**48.** *Sellers v. State*, 809 P.2d 676, 691 (Okl.Cr. 1991), *cert. denied*, 502 U.S. 912, 112 S.Ct. 310, 116 L.Ed.2d 252 (1991); *Fowler v. State*, 779 P.2d 580, 588 (Okl.Cr.1989), *cert. denied*, 494 U.S. 1060, 110 S.Ct. 1537, 108 L.Ed.2d 775

(1990); *Nguyen v. State*, 769 P.2d 167, 174 (Okl. Cr.1988), *cert. denied*, 492 U.S. 925, 109 S.Ct. 3264, 106 L.Ed.2d 609 (1989), *overruled on other grounds by Green v. State*, 862 P.2d 1271 (Okl.Cr. 1993).

**49.** *Valdez v. State*, 900 P.2d 363, 382 (Okl.Cr.), *cert. denied*, — U.S. —, 116 S.Ct. 425, 133 L.Ed.2d 341 (1995).

**50.** 21 O.S.1991, § 701.12(5).

**51.** See, *e.g.*, *Cannon v. State*, 904 P.2d 89, 107 (Okl.Cr.1995); *McGregor v. State*, 885 P.2d 1366, 1385 (Okl.Cr.1994), *cert. denied*, — U.S. —, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995); *Mitchell v.*

Hooper shot Tonya because he sought to avoid arrest or prosecution for Cindy's murder. Cindy's murder, although contemporaneous in time and place, provides a sufficient predicate crime. This proposition of error is denied.

■ In Proposition X Hooper claims evidence was insufficient to support the continuing threat aggravating circumstance. The jury found, as to all three victims, that Hooper would probably commit criminal acts of violence which would constitute a continuing threat to society.[52] Hooper does not claim that this aggravating circumstance is unconstitutional on its face, but he argues it was unconstitutional as applied to him. The State relied on two categories of evidence to support this circumstance: the circumstances of the crimes charged and the testimony of Stefanie Duncan, Hooper's ex-wife. Duncan testified that Hooper fought with her, beat her, and threatened to kill her several times. While she called the police after some of these fights, evidence did not show Hooper was charged or convicted of a crime in connection with these incidents.[53] Duncan's testimony consisted solely of unadjudicated

crimes. We have upheld the use of unadjudicated crimes evidence to support this aggravating circumstance,[54] and its use here is not unconstitutional.[55]

■ The State primarily argued that the callous and brutal circumstances of the crime alone proved Hooper would be a continuing threat to society. The prosecutor emphasized the "brutal and callous nature" with which Hooper murdered all three victims, and vividly reconstructed the State's theory of the murders, arguing the "vicious, cold-blooded murder" proved Hooper capable of anything. The prosecutor also argued Hooper's conduct after the murder supported this aggravating circumstance. The prosecutor said Hooper's actions in methodically concealing and attempting to destroy evidence were cold, remorseless and devious. This Court has upheld cases in which the callous nature of the crime was the sole evidence offered in support of this aggravating circumstance,[56] and in which this circumstance was supported by both the circumstances of the crime and evidence of unadjudicated offenses.[57] The continuing threat circumstance

State, 884 P.2d 1186, 1208 (Okl.Cr.1994); Barnett v. State, 853 P.2d 226, 233 (Okl.Cr.1993).

**52.** 21 O.S.1991, § 701.12(7).

**53.** Dr. Adams, a neuropsychologist, examined Hooper in April, 1993, and his report was admitted as Defendant's Exhibit 4 [see Proposition XII]. On page 5 the report states (1) Hooper pleaded no contest to assault and battery against Duncan, and served thirty days in jail; and (2) another woman "recently" filed assault charges against Hooper and he was on probation for those charges. Neither Dr. Adams nor any other witness testified about this information at trial. Although the report was before the jury, the evidence presented did not indicate Hooper had any prior convictions, and the State never claimed he was convicted of any crimes.

**54.** See, e.g., Snow, 876 P.2d at 298; Revilla v. State, 877 P.2d 1143, 1155–56 (Okl.Cr.1994), cert. denied, 513 U.S. 1096, 115 S.Ct. 764, 130 L.Ed.2d 661 (1995); Brown v. State, 871 P.2d 56, 73 (Okl.Cr.), cert. denied, 513 U.S. 1003, 115 S.Ct. 517, 130 L.Ed.2d 423 (1994); Ellis v. State, 867 P.2d 1289, 1301 (Okl.Cr.), cert. denied, 513 U.S. 863, 115 S.Ct. 178, 130 L.Ed.2d 113 (1994); Trice v. State, 853 P.2d 203, 220–21 (Okl.Cr. 1993), cert. denied, 510 U.S. 1025, 114 S.Ct. 638, 126 L.Ed.2d 597 (1993); Pickens v. State, 850 P.2d 328, 339 (Okl.Cr.1993), cert. denied, 510

U.S. 1100, 114 S.Ct. 942, 127 L.Ed.2d 232 (1994).

**55.** I have consistently disagreed with this holding. Cannon v. State, 904 P.2d 89, 106 (Okl.Cr. 1995); LaFevers v. State, 897 P.2d 292, 311 (Okl. Cr.1995); Hogan v. State, 877 P.2d 1157, 1167 (Okl.Cr.1994) (Chapel, J., dissenting on issue of unadjudicated crimes); Paxton v. State, 867 P.2d 1309, 1325 (Okl.Cr.1993) (Chapel, J., dissenting on issue of unadjudicated crimes). I yield my view to the majority.

**56.** Workman v. State, 824 P.2d 378, 383–84 (Okl. Cr.1991), cert. denied, 506 U.S. 890, 113 S.Ct. 258, 121 L.Ed.2d 189 (1992); Fisher v. State, 736 P.2d 1003, 1009 (Okl.Cr.), aff'd. on rehearing, 739 P.2d 523 (Okl.Cr.1987), cert. denied, 486 U.S. 1061, 108 S.Ct. 2833, 100 L.Ed.2d 933 (1988).

**57.** Sellers v. State, 809 P.2d 676, 690 (Okl.Cr. 1991), cert. denied, 502 U.S. 912, 112 S.Ct. 310, 116 L.Ed.2d 252 (1991) (evidence of the crime itself and unadjudicated offenses and bragging); Boltz v. State, 806 P.2d 1117, 1125 (Okl.Cr.1991), cert. denied, 502 U.S. 846, 112 S.Ct. 143, 116 L.Ed.2d 109 (1991) (evidence of the crime itself and unadjudicated offenses and bragging); Fox v. State, 779 P.2d 562, 577 (Okl.Cr.1989), cert. denied, 494 U.S. 1060, 110 S.Ct. 1538, 108 L.Ed.2d 777 (1990); Walker v. State, 723 P.2d

as applied here is not unconstitutional, and this proposition is denied.[58]

■ Hooper claims in Proposition XI that the aggravating circumstances of avoiding arrest and prosecution and continuing threat are duplicative because they are based on virtually the same evidence. Hooper's argument fails because this Court has repeatedly held there is no error in using the same evidence to prove two different aggravating circumstances where that evidence does not show the same aspect of the defendant or his crime.[59] The evidence suggesting Tonya ran from Hooper before he killed her was used (1) to show Hooper killed Tonya because she saw him kill her mother; and (2) to suggest that a person capable of this kind of crime would be likely to commit future crimes of violence. These show different aspects of Hooper's character and are not duplicative. This proposition is denied.

■ Hooper claims in Proposition XII that the trial court erred in permitting Dr. Adams to testify against him in second stage. Dr. Adams, a neuropsychologist, evaluated Hooper for learning disabilities in April 1993. Dr. Adams' evaluation was summarized in a comprehensive 11–page report, which Dr. Murphy reviewed [see Proposition VI, *infra*]. The trial court admitted Dr. Adams' report as Defendant's Exhibit 4. The State called Dr. Adams as a rebuttal witness. Dr. Adams refused to testify unless Hooper waived the physician-patient privilege. Hooper refused to waive his privilege and the trial court ordered Dr. Adams to testify over Hooper's objection.

The physician-patient privilege is waived where a defendant voluntarily "discloses or consents to disclosure of any significant part of the privileged matter." [60] Where a defendant relies on his physical, mental or emotional condition as an element of his defense, the privilege is qualified to the extent the State may obtain relevant information about the condition through discovery as provided by statute.[61] The Oklahoma Criminal Discovery Code provides for discovery of information regarding testimony relating to any condition bearing on a defendant's mental state at the time the crime was committed.[62] Hooper produced Dr. Adams' report in response to the State's request for discovery. He subsequently admitted the report to support his claim that his mental or psychological condition mitigated against imposition of the death penalty. By introducing the confidential material into evidence, Hooper waived his privilege.

■ Hooper argues there is, or should be, a distinction between a testimonial privilege and any documents he may introduce into evidence. He suggests he cannot have waived his privilege not to have Dr. Adams *testify* about the report by introducing the *written* report itself. He argues that he only introduced Dr. Adams' report to show the basis for Dr. Murphy's written conclusion, and it could be properly used only to cross-examine Dr. Murphy. We are not persuaded by this imaginative but baseless distinction. Hooper introduced Dr. Adams' report, which was based on confidential communications.

273, 286 (Okl.Cr.1986), *cert. denied*, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 600 (1986); *Ross v. State*, 717 P.2d 117, 123–24 (Okl.Cr.1986), *affrm'd*, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988); *Liles v. State*, 702 P.2d 1025, 1030–31 (Okl.Cr.1985), *cert. denied*, 476 U.S. 1164, 106 S.Ct. 2291, 90 L.Ed.2d 732 (1986) (evidence of the crime itself and unadjudicated offenses, *possession of weapons*).

**58.** This Court has looked with disfavor on the use of the circumstances of the crime to support this aggravating circumstance. *Perry v. State*, 893 P.2d 521, 536 (Okl.Cr.1995). I have disagreed with the use of circumstances of the crime to support this aggravating circumstance. *Cannon*, 904 P.2d at 106, n. 60. However, I yield my view to that of the majority. I would not uphold this aggravating circumstance based solely on the circumstances of the crime and evidence of unadjudicated offenses; upon reweighing the remaining aggravating circumstances with the evidence in mitigation I have determined that elimination of the improper aggravating circumstance does not affect the balance beyond a reasonable doubt.

**59.** *See, e.g., Allen v. State*, 871 P.2d 79 (Okl.Cr.), *cert. denied*, 513 U.S. 952, 115 S.Ct. 370, 130 L.Ed.2d 322 (1994).

**60.** 12 O.S.1991, § 2511.

**61.** 12 O.S.1991, § 2503(D)(3).

**62.** 22 O.S.Supp.1994, § 2002(B)(1)(c).

He voluntarily disclosed that information and thus waived the privilege as regards those communications. The State called Dr. Adams to testify about his findings and conclusions contained in his report. Although some of the information the State elicited was not clearly stated in the report, the trial court correctly concluded that information was within the report. Hooper offers no precedent supporting his argument that voluntary disclosure of a written confidential communication does not waive the privilege against testimony about the document by its author.

Hooper argues that Dr. Adams' testimony was improper because the trial court improperly deferred to Dr. Adams in determining whether he could testify as a result of the privilege.[63] He claims Dr. Adams told the court he would testify only with Hooper's waiver or in response to a court order. Hooper says this circumvented the statute by allowing Dr. Adams to dictate the limits of the privilege. This red herring is entirely unsupported by the evidence. As soon as the State called Dr. Adams, Hooper refused to waive his privilege. Before Dr. Adams entered the courtroom, the trial judge said he would hold an *in camera* hearing and order Dr. Adams to testify. Dr. Adams later confirmed that he could ethically testify if ordered, but he did not suggest the procedure.

Hooper finally claims generally that allowing this testimony undermined the Supreme Court's determination that communication should be protected. In *Jaffee v. Redmond*[64] the Court held statements to a psychotherapist, made after the incident at issue, were protected from compelled disclosure in a civil suit. Of course, the disclosure here was "compelled" only in the sense Dr. Adams was ordered to testify; Hooper had already waived the privilege as to the substance of his communications to Dr.

Adams. The Supreme Court's concerns in *Jaffee* distinguish it from Hooper's case. Dr. Adams did not treat Hooper, but merely tested him for a learning disability. Hooper divulged personal information in confidence during the testing. Dr. Adams' report indicates he referred Hooper to other services for potential treatment. The possibility that Hooper's confidential information would later be disclosed could not have affected his decision to divulge it for treatment purposes. Although Dr. Adams is a neuropsychologist, he was not treating Hooper for psychological problems. Hooper waived the privilege, the trial court appropriately ordered Dr. Adams to testify, and this proposition is denied.

▮▮▮▮ In Proposition XV Hooper argues the second stage jury instructions did not accurately instruct the jury on the manner in which it was to use and consider mitigating evidence. Hooper combines three complaints about second stage instructions. He neither objected to these instructions at trial nor submitted proposed instructions, thus waiving all but plain error. Hooper first claims the instructions failed to inform the jury that its findings regarding mitigating circumstances did not have to be unanimous. He suggests the second stage instructions may be interpreted to require the jury to determine mitigating circumstances unanimously. Oklahoma does not require that the jury unanimously find mitigating circumstances, and the trial court's failure to so instruct is not error.[65] Hooper next argues the instructions permitted the jurors to ignore mitigating evidence altogether, and seriously diminished the effect of his mitigating evidence. He argues that Instruction 32 (Uniform Instruction CR–438), which says the jury "may" consider circumstances extenuating or reducing moral culpability or blame, creates a doubt as to whether the jury

---

**63.** *Peninger v. State,* 811 P.2d 609, 612 (Okl.Cr. 1991) (privilege is a matter of law to be decided by the trial court).

**64.** —— U.S. ——, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996).

**65.** *Bryan,* 935 P.2d at 364; *Knighton v. State,* 912 P.2d 878, 896 (Okl.Cr.1996). The second edition

of the Oklahoma Uniform Jury Instructions, Criminal, contains a definition of mitigating circumstances which specifically informs jurors that unanimous findings of any given mitigating circumstance are not required (OUJI–CR 2d 4–78). This instruction restates settled law. It may assist future juries in their deliberations, but failure to give a similar instruction in this case is not error.

should consider mitigating evidence. As this Court has often held, the permissive language in this instruction reflects the correct constitutional standard and avoids any infringement on the jury's duty to determine individual punishment.[66] Finally, Hooper claims the trial court erred when it failed to instruct jurors that they could consider a sentence of life imprisonment or life imprisonment without parole even though they should find the existence of one or more aggravating circumstances beyond a reasonable doubt. The jury may impose a life sentence even if it finds aggravating circumstances outweigh mitigating circumstances. However, an instruction to this effect is not required.[67] Hooper's jury was instructed to impose a noncapital sentence if jurors had a reasonable doubt about his guilt on the charges in the Bill of Particulars. Hooper admits this Court has repeatedly rejected these arguments and offers no reason for the Court to reconsider earlier decisions. There was no plain error in the instructions, and this proposition is denied.

## ISSUES RELATING TO FIRST AND SECOND STAGE

 Hooper claims in Proposition V that prosecutorial misconduct prejudiced the jury's deliberations in both stages of trial. Hooper complains that the State's theory of Tonya's death was speculative, inflammatory and unsupported by the evidence. We disagree. Evidence showed that a bullet from Hooper's gun was embedded in a branch on the grave, pinning white fibers to the branch. The fibers matched fibers from the hood of Tonya's jacket. There was no blood or body fluids on the bullet or the fibers. Near the grave site a pool of blood from either Cindy or Tonya was found near a tree with a broken limb. Blue fibers on a limb next to the blood were also consistent with Tonya's coat, and a shell casing near the blood was fired

from the same gun as the bullet in the branch on the grave. Tonya's jacket hood had a hole through the blue fabric which appeared to have been caused by a small hot object, and white fibers protruded from the hole. The branch on the grave appeared freshly broken and appeared to match a fresh break on the tree next to the blood.

Hooper failed to object to the State's arguments and has waived all but plain error. No plain error exists. The prosecutor repeatedly argued that Tonya ran into the woods while Hooper killed her mother and brother. Then, Hooper shot at Tonya and missed, pursued, caught and killed her, and left her to die. Hooper complains that this scenario is pure inflammatory speculation. On the contrary, it appears to be a reasonable inference from the evidence. The State's comment that Hooper left Tonya to die alone with her blood draining on the ground is supported by the evidence of the isolated blood pool and the medical examiner's testimony that Tonya would have died quickly but the wounds would have caused extensive bleeding. In second stage the State expanded on this theory. The prosecutor said Tonya was immersed in a child's worst nightmare of being chased by an evil monster trying to kill her; she asked the jury to imagine what she went through and how terribly long that interval must have seemed between the shot that missed and the time Tonya was caught. This argument approaches improper solicitation of sympathy for the victim, but it is based on the evidence presented. The line of argument based on the State's theory of Tonya's death was not improper.

Hooper claims the State's theory was especially prejudicial when considered with the victim impact evidence offered by the children's grandmother. Barbara Jarman said she believed the death penalty was appropriate because she thought of Tonya being

**66.** *Rogers v. State*, 890 P.2d 959, 978 (Okl.Cr.), *cert. denied*, 510 U.S. 1100, 116 S.Ct. 312, 133 L.Ed.2d 215 (1995); *Pickens v. State*, 850 P.2d 328, 339–40 (Okl.Cr.1993), *cert. denied*, 510 U.S. 1100, 114 S.Ct. 942, 127 L.Ed.2d 232 (1994).

**67.** *Knighton*, 912 P.2d at 895; *Mitchell*, 884 P.2d at 1206. The second edition of the Oklahoma Uniform Jury Instructions, Criminal, includes an instruction that a jury may impose a sentence of life or life without parole even if the aggravating circumstances outweigh mitigation circumstances (OUJI–CR 2d 4–80). This instruction restates settled law. It may assist future juries in their deliberations, but failure to give a similar instruction in this case is not error.

chased, caught and shot in the face. [See Proposition VII, *infra*] Hooper argues this statement shows either a master plan or that the State and the victims' family were deliberately trying to influence the jury's emotions with an unfounded and inadmissible theory. Nothing in the record supports the allegation that the State prompted Mrs. Jarman's language, or that the prosecutor deliberately used Mrs. Jarman's testimony to reinforce the State's theory. Mrs. Jarman was in the courtroom throughout the trial and had the opportunity to hear both the evidence and the State's argument before testifying.[68] Two other family members gave victim impact testimony but did not mention that theory. The State's theory itself was neither inadmissible nor unsupported. Hooper's claim is without merit.

■■■■ Hooper also argues the prosecutor attempted to improperly evoke emotion in the jury. In second stage closing, the prosecutor urged the jury to remember the haunting victims' photographs when considering Hooper's capacity for future violence. Hooper fails to cite and we do not find any case supporting his argument that this was an improper attempt to evoke emotion. In the first stage, the prosecutor twice argued Hooper left Tonya to die in the woods while her blood spilled on the ground, and stated Cindy only had time to inhale a small amount of blood into her lungs between the first and second shots. These comments are reasonable inferences and deductions from the evidence. The prosecutor also argued in first stage that to understand why Hooper murdered two children was to realize the depths of ruthlessness behind his "stone cold evil" eyes. Witness Harper testified without objection that Hooper had "stone cold evil" eyes during one fight with Cindy, and this

argument was also a reasonable deduction from the evidence.

The State's theory of Tonya's death was supported by the evidence, as were other comments made in closing argument. None of the other comments of which Hooper complains were improperly prejudicial. Hooper has not shown the prosecutor acted inappropriately. There is no plain error, and this proposition is denied.

■■■■ Hooper claims in Proposition VI that he was denied effective assistance of counsel at first and second stages of trial. He argues in five subpropositions that counsel was ineffective. To prevail on a claim of ineffective assistance of counsel Hooper must show his attorney's performance is so deficient that he did not have counsel as guaranteed by the Sixth Amendment, and counsel's deficient performance created errors so serious as to deprive Hooper of a fair trial with reliable results.[69] In capital cases, there must be a reasonable probability that, absent errors, the sentencer would have concluded the balance of aggravating and mitigating circumstances did not support a death sentence.[70] There is a strong presumption that counsel's conduct was professional and the defendant must overcome the presumption that counsel's conduct equaled sound trial strategy.[71] We consider counsel's challenged conduct on the facts of the case as viewed at the time, ask if the conduct was professionally unreasonable, and, if so, whether the error affected the jury's judgment.[72] We need not determine whether counsel's performance was deficient if we find that Hooper was not prejudiced by the claim.[73]

■■■■ If a defendant shows that counsel's actions have prejudiced him, this Court will look to the first prong of *Strickland* and determine whether counsel's performance

---

**68.** The Rule was invoked, but both parties noted victim impact witnesses were present in the courtroom and neither party objected.

**69.** *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064.

**70.** *Bryan*, 935 P.2d at 361; *LaFevers v. State*, 897 P.2d 292, 306 (Okl.Cr.1995), *cert. denied*, — U.S. —, 116 S.Ct. 820, 133 L.Ed.2d 763 (1996).

**71.** *Bryan*, 935 P.2d at 361; *Hammon v. State*, 898 P.2d 1287, 1309 (Okl.Cr.1995); *Camron v. State*, 829 P.2d 47, 55 (Okl.Cr.1992).

**72.** *Bryan*, 935 P.2d at 361–62; *McGregor v. State*, 885 P.2d 1366, 1381 (Okl.Cr.1994), *cert. denied*, — U.S. —, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995).

**73.** *Coleman v. State*, 693 P.2d 4, 7 (Okl.Cr.1984); *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069.

was deficient. In doing so, we require more than the mere allegations that counsel failed to raise a meritorious issue, conducted insufficient investigation, or failed to present important evidence.[74] We recently explained this standard in the context of capital post-conviction, where we held a post-conviction petitioner must show actions indicating that counsel breached some duty owed to him, or that counsel's judgment was unreasonable under the circumstances or did not fall within the wide range of professional assistance.[75] While these were capital post-conviction cases, our interpretation of the *Strickland* requirement of "deficient performance" is not limited to post-conviction claims of ineffective assistance of counsel. In *Wilhoit v. State* [76] we held counsel's performance was deficient when evidence showed counsel suffered from alcohol dependence and abuse and brain damage during defendant's trial. These difficulties affected counsel's actions and judgment, and his prejudicial failure to introduce important bite-mark evidence was deficient performance amounting to ineffective assistance of counsel. We continue to interpret the "deficient performance" requirement consistently, and require more than allegations that counsel's particular acts or omissions prejudiced a defendant.

In Subproposition A Hooper claims trial counsel was ineffective for failing to move to quash Hooper's arrest warrant and to suppress evidence derived solely from the arrest. Hooper relies on his Proposition I claim that his arrest was illegal because the affidavit in support of the arrest warrant had insufficient facts to show probable cause to arrest him. This argument has failed. As the affidavit and warrant were sufficient, Hooper's arrest was not illegal and he was not entitled to have the evidence resulting from his arrest suppressed. Counsel cannot be ineffective for failing to challenge a sufficient warrant. Hooper cannot show he was prejudiced by counsel's failure to challenge the arrest warrant and resulting evidence, and this subproposition is denied.

In Subproposition B Hooper claims trial counsel was ineffective in making a comment which, he claims, effectively waived a previously preserved error. Hooper objected vigorously to photographs of the victims' bodies immediately after they were removed from the grave, and the trial court sustained Hooper's objections to some of the photographs. After the photographs were published to the jury, the trial court noted for the record that he had not observed any jury reactions to the pictures which were out of the ordinary, and trial counsel Lee agreed. The jury did not hear this exchange. Hooper claims trial counsel's comment was gratuitous and damaging and waived an otherwise properly preserved issue for appellate review. Hooper fails to show how he was prejudiced by counsel's comment. This Court has not considered whether the photographs introduced at trial were inadmissible since Hooper does not allege that proposition of error. Even if we were to determine Lee waived the issue of photographs for review on appeal, Hooper cannot show this action prejudiced him since he does not raise the issue of admissibility. He seems to suggest this Court should determine whether the photographs were admissible in order to determine counsel's effectiveness, but it is Hooper's responsibility to raise this issue properly if he wishes it determined on its merits. As it is, Hooper merely alleges counsel waived what might have been a meritorious claim. This allegation does not show counsel was ineffective, and this subproposition is denied.

In Subproposition C Hooper claims counsel was ineffective in hiring Kathleen Lobato, the Defense's DNA expert. Hooper claims his DNA evidence did not establish a defense and supported the State's case. He claims counsel erred in failing to seek adequate funds to thoroughly test the blood on his tennis shoes. The State's expert had attempted to test his right tennis shoe but failed to extract DNA sufficient for analysis.

**74.** *Walker v. State,* 933 P.2d 327, 333–34 (Okl.Cr. 1997); *Camron,* 829 P.2d at 55.

**75.** *See, e.g., Mitchell v. State,* 934 P.2d 346, 349–50 (Okl.Cr.1997); *Walker,* 933 P.2d at 336.

**76.** 816 P.2d 545, 546 (Okl.Cr.1991).

Hooper hired Lobato to test the right shoe for Cindy's DNA. Lobato tested the shoe and found blood consistent with Cindy's, but also found blood inconsistent with Cindy or Hooper. She did not test the sample for the children's DNA. Hooper apparently introduced this evidence hoping to argue that an unknown person was at the scene but the State countered that the blood probably belonged to one of the children. This evidence could not have been unduly prejudicial in light of the other DNA evidence connecting Hooper to the crime as well as the other evidence presented against him. This was Lobato's first opportunity to testify as an expert. The State's expert was well qualified and had testified in numerous courts as a DNA expert. However, given the circumstances at trial this discrepancy could not have prejudiced Hooper since Lobato was able to extract a DNA sample where the State's expert could not.

Hooper was declared indigent the first day of trial, and the trial court negotiated with the Oklahoma Indigent Defense System throughout trial proceedings for Lobato's travel expenses and fee. Although Hooper did not know just where the money would come from, there was no doubt that Lobato would be paid. Hooper had requested the tests before he was declared indigent. Lobato testified that she had not tested Hooper's shoe for the children's DNA because she was not paid to do so. Hooper now claims that trial counsel was ineffective in failing to ask Lobato to test the shoe for the children's DNA, and in failing to declare Hooper indigent sooner or ask for more money. Hooper has not shown he was prejudiced by trial counsel's decision to test only for Cindy's DNA. Had Lobato determined the blood was not consistent with the children, that exculpatory evidence would still be weighed against the weight of evidence against Hooper, including the fact that Cindy's blood spotted both shoes. Hooper also has not shown counsel's action was not a reasonable strategic decision since trial counsel may have been aware that further testing was likely to reveal the spot was consistent with Tonya or Timmy. This subproposition is denied.

In Subproposition D Hooper claims counsel was ineffective in failing to argue that he could not have committed the crimes in the time available. Hooper constructs an elaborate timeline and argues that he could not have committed the crimes within that time. He claims trial counsel was ineffective for failing to make this argument at trial. The State correctly argues that this timeline is not persuasive based on the evidence at trial. Hooper responds that counsel did not have the burden of persuasion but only needed to raise a reasonable doubt for the jury. Hooper misunderstands his task on appeal. He must show this Court that counsel's performance prejudiced him. Failure to make an unpersuasive argument cannot be prejudicial, even if that argument might possibly have raised a reasonable doubt. This subproposition is denied.

In Subproposition E Hooper claims counsel must have been ineffective given the lack of mitigating evidence as well as the effect of mitigating evidence presented. Hooper first argues that counsel's duty to present mitigating evidence was not waived. The record shows that Hooper initially considered waiving his second stage defense, and counsel advised Hooper against that decision. When Hooper suggested this before trial, counsel Krogh told him they should put that decision "on the back burner" until first stage was finished. The morning second stage began Hooper decided not to waive his second stage defense and instructed counsel to "severely limit or restrict" direct examination of his mother. Both trial attorneys emphasized for the record that they did not intend to respect Hooper's wishes and felt it was their responsibility to make tactical decisions regarding the nature and extent of examination. The trial court explained the second stage proceedings to Hooper, told him now was his only opportunity to present mitigating evidence, and suggested he follow counsel's advice. Counsel called Hooper's mother and in a wide-ranging examination attempted to elicit details suggesting that Hooper was separated from his mother and neglected as a child. Hooper claims Krogh's "back burner" comment indicates counsel deferred preparation of mitigating evidence un-

til after completion of the first stage. The record does not support this claim. Hooper also appears to argue he did not waive the right to present mitigating evidence. The record certainly would not support a waiver, and nobody suggests Hooper waived his right to present evidence.

██ Second, Hooper argues counsel ineffectively presented Dr. Murphy's evidence. Before trial Dr. Murphy reviewed Dr. Adams's comprehensive 11–page report, and summarized his conclusions on one page. Dr. Murphy testified in second stage to authenticate his summary and to identify Dr. Adams' report as the basis for his conclusions. The trial court admitted Dr. Murphy's summary as Defendant's Exhibit 3 and Dr. Adams' report as Defendant's Exhibit 4.[77] Counsel never asked Dr. Murphy to examine Hooper and never talked to Dr. Adams before introducing his report into evidence. Dr. Murphy's summary states he believed Dr. Adams found evidence of "mild but probable brain damage". On cross-examination Dr. Murphy confirmed he had never met Hooper and for that reason didn't have "enormous stock" in his conclusion. In rebuttal, Dr. Adams testified he found no evidence of brain damage. Neither Dr. Murphy nor Dr. Adams had any true mitigating evidence and their combined testimony was disastrous for Hooper: they told the jury Hooper did not have brain damage and had no particular trouble controlling his temper or behavior, and his learning disability would not have affected his capacity for violence or ability to reason in adverse circumstances.

Ample evidence in the record shows that Dr. Murphy did not wish to testify. The afternoon before second stage began, trial counsel Lee called Dr. Murphy; Dr. Murphy told Lee it would be unethical for him to give an opinion about Hooper since he had never examined him, and said any evidence he could give would be evidence in aggravation. Trial counsel Krogh subpoenaed Dr. Murphy for the next day. During an *in camera* hearing Krogh explained that counsel only

wanted Dr. Murphy to authenticate his summary, so they could admit it, along with Dr. Adams' report, in evidence. Krogh said they had intended to question Dr. Murphy further but felt compelled for tactical reasons to introduce the summary, since they believed some comments were potentially mitigating. Krogh asked the court to declare Dr. Murphy a hostile witness, said Dr. Murphy's attitude caused counsel to modify their trial tactics, and admitted he was afraid of what Dr. Murphy might say.

Hooper argues that counsel used lack of funds as an excuse for their poor performance, and that counsel should have known better because Hooper was entitled to a psychiatric expert at State expense. The record reflects counsel knew this. Krogh said Dr. Murphy was paid to review records, given the limited defense funds. The trial court noted Hooper had not been denied any witnesses for lack of money. Krogh said they were not claiming lack of money diminished their defense. The record does not clearly support Hooper's assertion that counsel believed they could not afford to ask Dr. Murphy to examine Hooper.

Krogh then explained counsel originally intended to hire a psychological expert from out of state, but Lee knew of Dr. Murphy, felt he had experience in this area, and did not anticipate any problem. Counsel appeared to believe Dr. Murphy, who frequently testifies on behalf of persons facing the death penalty, would be able to express an opinion helpful to Hooper after reviewing another doctor's report of an evaluation conducted for a wholly separate purpose. Counsel also appeared to believe a diagnosis of learning disability would somehow affect Hooper's ability to make decisions and make him prone to violence. As a consequence, Drs. Murphy and Adams presented the jury with a full explanation of Hooper's learning disability, refuted counsel's apparent beliefs and damaged Hooper's case.

Hooper correctly argues counsel should have realized the State would attempt to call

---

77. Defendant's Exhibit 4 was a copy of a facsimile transmission. It is underlined with handwritten margin notes, and contains information that Hooper had been convicted at least once of mis-

demeanor assault and battery and was on probation at the time of the evaluation [see Proposition X].

Dr. Adams as a witness if they admitted his report into evidence. Without Hooper's actions, Dr. Adams' testimony would have been privileged and inadmissible. Counsel's failure to talk to Dr. Adams before admitting his report into evidence was overwhelmingly prejudicial. Counsel wanted the jury to hear Dr. Murphy's conclusion that Dr. Adams had found evidence of probable brain damage. Their failure to ask Dr. Adams his interpretation of his own evaluation was inexplicable, since Dr. Adams had not found brain damage. The State merely suggests we should not consider "in hindsight" the disastrous effect of that decision. Assuming counsel will consider foreseeable consequences of acts and omissions is not hindsight.

Hooper raises serious questions about trial counsel's decisions to call Dr. Murphy and admit the two medical reports. Hooper has shown counsels' actions prejudiced him and he has met the second prong of *Strickland.* We now turn to the first prong and determine whether Hooper has shown deficient performance. We look to the record for evidence indicating that counsel breached some duty owed to Hooper, or that counsel's judgment was unreasonable under the circumstances or did not fall within the wide range of professional assistance. *Strickland* lists some basic duties defense counsel owes each client. These include 1) "a duty of loyalty, a duty to avoid conflicts of interest" [78]; 2) to advocate a defendant's cause; 3) to consult with him on important decisions; 4) to keep him informed of important developments; 5) to use skill and knowledge to render the trial a reliable adversarial testing process; [79] and 6) a duty to investigate or make reasonable decisions rendering particu-

lar investigations unnecessary.[80] In determining whether counsel's acts or omissions were outside the wide range of professionally competent assistance, this Court considers that counsel's function is to make the adversarial testing process work.[81]

Hooper relies on the record for evidence of counsels' unprofessional judgment.[82] Essentially he complains about the quality of the mitigating evidence counsel chose to present, and claims counsel should have presented more or different evidence. We have held that counsel is not per se ineffective for failing to present mitigating evidence in a capital case.[83] A thorough review of the record shows counsel presented a case in mitigation on Hooper's behalf. Hooper may wish counsel had done things differently, but "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." [84] In determining deficient performance, this Court does not consider the consequences of conduct in isolation. Hooper has not shown why counsels' reasons for deciding to present Dr. Murphy, his summary, and Dr. Adams' report, or failing to talk to Dr. Adams, amount to ineffective assistance. We do not find counsels' acts and omissions created a complete breakdown of the adversarial testing process. Hooper does not meet the first prong of *Strickland.* He has not shown that counsels' performance was deficient.

Hooper also claims several other deficiencies in second stage evidence. He suggests that counsel was ineffective in failing to call any witnesses other than Hooper's mother and stepfather. The record does not show this decision was ineffective. Hooper notes

78. *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2065.

79. *Id.*

80. *Strickland,* 466 U.S. at 691, 104 S.Ct at 2066.

81. *Strickland,* 466 U.S. at 690, 104 S.Ct at 2066.

82. Hooper filed a Motion for Evidentiary Hearing on issues of ineffective assistance of counsel, which we denied. I would grant Hooper's motion and remand these issues for an initial hearing in the district court, but I yield my view to the majority. In fairness, I believe we must provide an avenue for defendants to fully raise

claims of ineffective assistance of counsel. Our capital post-conviction scheme requires petitioners to raise on direct appeal any issues of ineffective assistance supported by facts that were or could have been used in a direct appeal. To meet this requirement appellate counsel may engage in investigation. Hooper has conducted an investigation and presented this Court with a motion supported by affidavits as required by our rules.

83. *Wallace v. State,* 893 P.2d 504, 510 (Okl.Cr. 1995).

84. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.

that Instruction 33, listing mitigating circumstances, contained incorrect information and listed factors which either had little support in evidence or were not necessarily mitigating. Hooper's age is wrong, but he does not show how this or the other factors listed prejudiced him.

Hooper claims trial counsel was ineffective for failing to object contemporaneously to the prosecutor's closing arguments and to Mrs. Jarman's victim impact testimony. Hooper's claim depends on the success of his allegations of prosecutorial misconduct and improper victim impact evidence. We have determined there was no prosecutorial misconduct (see Proposition V), and Mrs. Jarman's improper opinion evidence was not so prejudicial as to affect the jury's decision (see Proposition VII). Counsel cannot be ineffective for failing to object to these comments. Hooper has not shown he was prejudiced by counsel's actions.

In summary, Hooper raises several claims of ineffective assistance of counsel. Hooper fails to show prejudice on most of these claims. In one instance Hooper shows he was prejudiced by counsel's actions but has not demonstrated those actions constituted deficient performance. This proposition is denied.

In Proposition XIV Hooper claims the accumulation of errors in the case requires relief. This Court has often held that where there is no individual error, there is no accumulation of error.[85] A thorough review of the record and Hooper's propositions shows no prejudicial error occurred in the first stage of trial. No second stage error requires relief individually or in accumulation. This proposition is denied.

## MANDATORY SENTENCE REVIEW

In accordance with 21 O.S.1991, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of aggravating circumstances. Upon review of the record, we cannot say the sentence of death was

imposed because the jury was influenced by passion, prejudice, or any other arbitrary factor.

 As discussed above, evidence supports all three aggravating circumstances. In mitigation Hooper offered evidence that he 1) was kidnapped as an infant; 2) had a stormy and troubled childhood including several separations from his mother; 3) suffered from a learning disability which caused him to be argumentative and frustrated; 4) was impulsive and had difficulty completing projects; 5) had a history of teenage alcohol and substance abuse; 6) had received counseling; 7) was often a helpful and good person; and 8) loved and cared for animals. Instruction 33 listed in mitigation 1) lack of high school education; 2) any psychological problems based on the evidence at trial; 3) Hooper's childhood, adolescence and lack of nurturing relationship with his mother; 4) any learning deficit or disability; 5) Hooper's youth; and 6) any child abuse which may have been shown at trial.

After careful, independent review and consideration of the evidence supporting the aggravating circumstances, as well as the evidence offered in mitigation, we find the sentences of death factually substantiated and appropriate.

Finding no error warranting modification or reversal, the Judgment and Sentence of the District Court of Canadian County is **AFFIRMED.**

STRUBHAR, V.P.J., and JOHNSON, J., concur.

LUMPKIN and LANE, JJ., concur in results.

LANE, Judge, concurring in results.

*I concur in results by reason of stare decisis.* I still maintain that 22 O.S.Supp.1996, § 984–984.2 does not apply during the second stage of a Murder in the First Degree trial. Only 21 O.S.Supp.1996, § 701.10 applies.

---

85. *McGregor,* 885 P.2d at 1385.

See my special vote in *Ledbetter v. State*, 933 P.2d 880, 902–03 (Okl.Cr.1997).